County of Allegheny *versus* Gibson's Son & Co.

Same *versus* Webb & Co.

1. The Act of May 31st 1841, which makes the county of Philadelphia liable for property destroyed by a mob, and which was extended to the county of Allegheny by the Act of March 20th 1849, is not repealed by the adoption of the new constitution.

2. The act is both a remedial and penal statute and must be liberally construed. · The fact that the county authorities are unable to quell a riot does not limit the liability of the county for damages done thereby.

3. The act is intended to embrace every form of riotous disturbance, whether large or small.

4. The fact that property is *in transitu* at the time of its destruction does not exempt the county from liability, and it applies as well to the property of non-residents as to citizens of the state.

5. It is not necessary that a property-owner should give notice to the county authorities, unless he has a knowledge of an intention on the part of the mob to destroy his property, and sufficient time intervenes to enable him to give the notice contemplated. Such notice is not necessary where the authorities have knowledge of the intention or attempt to destroy property.

6. The fact that the state, when called upon, rendered its assistance and sent a portion of its military to the scene, did not absolve the county from its obligation to keep the peace, nor from its responsibility for a neglect of that duty.

6. What is the meaning of the words " illegal or improper conduct," in the act, defined by PAXSON, J.

May 29th and 30th 1879. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, WOODWARD and TRUNKEY, JJ. STERRETT, J., withdrew before the argument.

Error to the Court of Common Pleas of *Beaver county:* Of October and November Term 1878, No. 163.

This case was certified to the Middle District from the Western District. It was originally brought in Allegheny county, but the venue was afterwards changed to Beaver county.

Trespass on the case by John Gibson's Son & Co., of Philadelphia, against the county of Allegheny, for the loss of sixty barrels of whiskey, destroyed by the mob during the labor riots, which occurred in said county in July 1877.

At the trial, before Hice, P. J., it appeared that the whiskey was shipped at Cincinnati on the 16th of July 1877, to be carried to Philadelphia, over the Pittsburgh, Cincinnati & St. Louis Railroad and the Pennsylvania Railroad; that it arrived at Pittsburgh on the morning of the 19th of July; that on the evening of that day the sheriff of the county of Allegheny was notified by the officers of the Pennsylvania Railroad Company, that a number of men had forcibly taken possession of a portion of the railroad company's property, and the freight of shippers, and were obstructing

the passage of trains. These officers also requested the sheriff to go in person and disperse the mob. He sent for some of his deputies and proceeded to the scene of the disturbance. Upon his arrival he found several hundred men in possession of the company's road, whom, as sheriff of the county, he ordered to disperse. This, in the language of the sheriff, "they positively refused to do," and said "they were going to hold that road, and that they were going to wade in blood to their waists." This effort proving unavailing, the sheriff returned to his home, and on the way sent a telegram to the governor, asking for troops to quell the riot. An order was sent to the general commanding at Pittsburgh, to assist the sheriff with the troops. On Friday and Saturday efforts were again made by the sheriff to have the mob disperse, but on neither occasion was he accompanied with a posse or military force, his efforts to procure a posse having been unsuccessful. On the afternoon of Saturday he accompanied the portion of the state military force, which had arrived from Philadelphia, to 28th street, where the mob was in possession of the railroad. Here the sheriff again addressed the rioters and commanded them to disperse. His efforts were again unavailing, and the military were then brought up and attempted to force back the mob in possession of the road. The rioters assaulted the soldiery with stones, clubs and pistol shots, and the latter then fired on the mob and a number of persons were killed and wounded. In a few hours the mob was largely augmented in numbers, and during the evening and night, and the following morning, the property of the railroad company, including its shops, elevator and hotel, and the trains upon the road, were all destroyed by fire kindled by the mob, who surrounded the property and trains, and would allow no interference to extinguish it. In the fire thus enkindled, the whiskey in suit was burned. This action was brought against the county, under the provisions of the Act of May 31st 1841, Pamph. L. 416, extended to Allegheny county, by the Act of March 20th 1849, Pamph. L. 184, whereby it was enacted:

Sect. 7. In all cases where any dwelling-house or other building or property, real or personal, has been or shall be destroyed, within the county of Philadelphia, in consequence of any mob or riot, it shall be lawful for the person or persons interested in, and owning such property, to bring suit against the said county where such property was situated, and being for the recovery of such damages as he or they sustained by reason of the destruction thereof, and the amount which shall be recovered in said action shall be paid out of the county treasury, on warrants drawn by the commissioners thereof, who are hereby required to draw the same as soon as said damages are finally fixed and ascertained.

Sect. 8. No person or persons shall be entitled to the benefits of this act, if it shall appear that the destruction of his or their property was caused by his or their illegal or improper conduct,

[County of Allegheny *v.* Gibson.]

nor unless it be made to appear that he or they, upon the knowledge had of the intention or attempt to destroy his or their property, or to collect a mob for such purpose, and sufficient time intervening, gave notice thereof to a constable, alderman, or justice of the peace, of the ward, borough, or township, in which such property may be situated, or to the sheriff of the said county, and it shall be the duty of the said sheriff, alderman, constable, or justice, upon the receipt of such notice, to take all legal means to protect said property so attacked, or threatened to be attacked, and if the sheriff, alderman, constable, or justice of the peace, upon the receipt of such notice, or upon knowledge of such attack or intended riot, or disturbance, shall neglect or refuse to perform his duties in the premises, he or they, so neglecting or refusing, shall be liable for the damages done to such property, to be recovered by an action on the case, in the Court of Common Pleas of the proper county, and shall be deemed guilty of a misdemeanor in office, and on conviction thereof by the proper court, his commission shall be void.

The following assignments of error will show the various questions in the case and the manner in which they were raised in the court below:

1. The court below erred in affirming the plaintiffs' first point, viz.: That under all the evidence in this case, if the same be believed by the jury, the plaintiffs are entitled to recover.

2. The court below erred in refusing to allow the defendants to prove the facts contained in their second offer, in the following words, to wit: That on the afternoon of July 19th 1877, a strike of the employees of the Pennsylvania Railroad Company was inaugurated; that the said strike was occasioned by the reduction of wages of the said employees, and by increasing their duties; that no destruction of property, actual or threatened, took place until after the railroad authorities, on July 21st, at 5 P. M., by means of state troops sent to their aid by the state authorities, had endeavored to run their trains and enforce their rules against their striking employees by attacking them with arms and shooting down some of their number; the purpose of this offer being to show that the railroad company, in electing to forcibly run its trains and shoot down striking employees, thereby occasioned the mob and was responsible for the consequences, and was guilty of improper conduct within the meaning of the statute.

3. In refusing to allow the defendants to prove their fourth offer, to wit: That the riot and violence that took place in the county of Allegheny on the 20th, 21st and 22d of July 1877, and which resulted in the destruction of the plaintiffs' goods, was not a local mob or riot within the meaning of the Act of Assembly under which the suit is brought, but was a part only of a widely extended and organized insurrection which broke out simultaneously in widely distant parts of the country, and to prove said

[County of Allegheny *v.* Gibson.]

allegations defendant proposes to show that riots similar to that which resulted in the destruction of plaintiffs' goods, broke out simultaneously with it at Martinsburg, West Virginia; at Cumberland and Baltimore, Maryland; at Harrisburg and Reading, Pennsylvania; at Dennison and Newark, in the state of Ohio, and at Chicago, Illinois. That the governors of the respective states in which said outbreaks took place were compelled to call out the military forces of the state and to issue proclamations and to call upon the president of the United States, who responded to said call by placing a portion of the military forces of the general government at the disposal of the state authorities; and that the said outbreak, by reason of its nature and extent, was beyond the power of the local authorities to anticipate or to subdue. The purpose of the offer being to show that the outbreak and violence which resulted in the destruction of the plaintiffs' goods did not constitute a mob or riot within the contemplation of the statute declared on.

4. In refusing to allow the defendants to prove, as contained in their fourth offer: That the said outbreak, by reason of its nature and extent, was beyond the power of the local authorities to anticipate or to subdue. The purpose of this part of the offer being to show that the outbreak and violence which resulted in the destruction of the plaintiffs' goods, did not constitute a mob or riot within the contemplation of the statute declared on.

5. In refusing to charge the jury as requested in the defendants' sixth point, to wit: That the state authorities having, at the request of the county and railroad authorities, called out the state military forces and sent them to the scene of the strike at Pittsburgh, and said forces having appeared there before any destruction, actual or threatened, of property had taken place, and having undertaken to subdue, and overpower the alleged rioters, the county was thereby relieved from any liability for loss thereafter occasioned, and is not liable to the plaintiffs in this action.

6. In not affirming the defendant's fifth point, which was as follows: If the jury find from the testimony that the whiskey, for the loss or destruction of which the plaintiffs claim to recover, was shipped at Cincinnati, Ohio, to be carried thence to Philadelphia, in the ordinary course of transportation by the Pittsburgh, St. Louis & Cincinnati Railroad Co., and the Pennsylvania Railroad Co., as common carriers, and that said whiskey was destroyed by a mob or riot, while at Pittsburgh, in the cars of said railroad company, en route to its destination, then the property was not property situate in the county defendant, within the meaning of the Act of Assembly given in evidence.

7. In not affirming the defendant's sixth point, which was as follows: That the state authorities having, at the request of the county and railroad authorities, called out the state military forces and sent them to the scene of the strike at Pittsburgh,

[County of Allegheny v. Gibson.]

and said forces having appeared there, before any destruction, actual or threatened, of property had taken place, and having undertaken to subdue and overpower the alleged rioters, the county was thereby relieved from any liability for loss thereafter occurring, and is not liable to the plaintiffs in this action.

8. In not affirming the defendant's seventh point, which was as follows: None but citizens or residents of the state of Pennsylvania are entitled to the benefit of said seventh section of the Act of May 31st 1841, and it being conceded that the plaintiffs were not citizens or residents of said state, at the time of the destruction of the property, the value of which is sued for in this case, there can be no recovery, and the verdict should be for the defendant.

9. In refusing to charge as requested in defendant s first point, which was: That the seventh section of the Act of Assembly of May 31st 1841, is in contravention of the constitution of the United States, and therefore void.

10. In refusing to charge as requested in defendant's second point, which was: That the seventh section of the Act of May 31st 1841, is void, being in violation of the constitution of the state of Pennsylvania.

11. In refusing to charge as requested in defendant's third point, which was: That the first section of the Act of March 20th 1849, extending the seventh section of the Act of May 31st 1841, to Allegheny county, is in violation of the constitution of the United States and of the constitution of Pennsylvania.

12. In refusing to charge as requested in the fourth point of defendant, as follows: That by the adoption of the new constitution of Pennsylvania, which took effect and became operative on the first of January 1874, the said seventh section of the Act of Assembly of May 31st 1841, was abolished and rendered null and void, as was also the first section of the Act of March 20th 1849, extending it to Allegheny county.

The verdict was for plaintiffs for $3131.39, and after judgment, the defendant took this writ, and alleged that the court erred as set forth in the foregoing assignments of error.

The case of the County of Allegheny v. Webb, was argued with this case. The cases were substantially alike, except that Webb & Son were not residents of Pennsylvania; and it was contended, that the Act of 1841 did not give to them a right of action.

*S. H. Geyer, George Shiras, Jr., George W. Biddle* and *Daniel Agnew*, for plaintiff in error.—The plaintiffs did not prove any notice to the county authorities of any intent to destroy their property, or that a mob had been collected for such purpose, nor that sufficient time had not intervened to enable them to do so. The railroad company was guilty of illegal and improper conduct

9 Norris—26

[County of Allegheny *v.* Gibson.]

within the meaning of the Act of 1841. Such conduct is a good defence to the county. If the law is to be applied to goods *in transitu,* it is error to reject the conduct of the carriers. If, on the other hand, the conduct of the carrier is immaterial, it must be because the law cannot be applied to such property. The true intent of the statute must govern: Bac. Abr., vol. 9, tit. *Statutes,* p. 237; Dwarris on Stats., chap. 12; 1 Bl. Com. 61–87; Cadbury *v.* Duval, 10 Barr 270; Commonwealth *v.* Fraim, 4 Harris 169; Commonwealth *v.* Erie & N. E. Railroad Co., 3 Casey 339. The framers of the Act of 1841, in using the words "any dwellinghouse or other building or property, real or personal," could not have intended long lines of freight cars, laden with the effects of distant owners; and did not mean by the words "any mob or riot," a vast combination of men, outside as well as inside of the county. Where an insurrection is, by reason of its nature and extent, beyond the power of the local authorities to anticipate or subdue, a county cannot be held liable for the loss of property destroyed during and in consequence of it. The presence of the military relieved the local authorities from all obligation to control the mob. The control of affairs was then taken out of the hands of the local authorities, and the responsibility of the county was at an end.

On general principles, and on the express provisions of the new constitution, all former laws inconsistent with the true intent and purpose of the new constitution, fell at the moment of its adoption, unless preserved by some express provision. When a former frame of government is abrogated by the people themselves, and a new government substituted, as an entirety, in its room, all laws not essential to preserve vested rights and existing necessary institutions, fall with the superseded government, unless preserved by the new frame.

The Act of May 31st 1841 is inconsistent with the new constitution, for it conflicts with the 7th section of the 3d article, which declares that the General Assembly shall not pass any local or special law regulating the affairs of counties, cities, townships, wards, boroughs or school districts. What plainer regulation of the affairs of a county than to enact that it shall pay losses caused by rioters? It is inconsistent with the 8th section of the 9th article, limiting the debt of any county to seven per centum of its assessed valuation of its taxable property. No limit can be set to a loss caused by the destruction of rioters. If the sums recovered exceed seven per cent. on the assessment, how is payment to be made? It is inconsistent with the 10th section of the 9th article, and with the 2d and 3d sections of the 15th article. It is inconsistent with the equality of persons, benefits and burdens maintained and enforced in said constitution. It is incompatible with the constitutional guarantees of the right of private property. The act is also inconsistent with the 14th amendment to the Constitu-

tion of the United States. Special, local and exclusive burdens cast upon a certain number of persons, within certain ascertained boundaries, deny to them the equal protection of the laws. The cases of Lehigh Iron Co. v. Lower Macungie Twp., 31 P. F. Smith 482, Wattson v. Chester & Delaware River Railroad Co., 2 Norris 254, and Indiana County v. Agricultural Society, 4 Id. 357, are not in conflict with this view, because the acts which in these cases are decided to remain still in force, are local laws, essential to vested rights or to maintain existing institutions, and necessary regulations, and of these the 7th section of the 3d article is not an *ipso facto* repeal. The Act of 1841 was necessary to preserve no vested right or existing institution, when the constitution was adopted. It had, then, attached itself to nothing and was a *potentia remotissima* only. Being, therefore, unnecessary, and being inconsistent with many parts of the new constitution, and wholly repugnant to its general spirit, purpose and action, it fell at its adoption.

*D. T. Watson, M. W. Acheson* and *Thomas M. Marshall,* for defendants in error.—Notice was given to the sheriff by the officers of the railroad company. In order to defeat a recovery where the mob has destroyed one's property, it must, in some way, *appear* in the case, that the destruction complained of *was caused* by the claimants' illegal or improper conduct. "*Was caused*" are the words of the act. They admit of no doubtful meaning. They mean that the conduct which will prevent a recovery is such that the destruction was the *natural* and necessary effect. The conduct was the *proximate* cause; the destruction the *natural* effect and necessary consequence: Laveny v. Phila. County, 2 Barr 233; Donoghue v. Phila. Co., Id. 230; Eby v. County of Niagara, 36 N. Y. 197; Blodget v. County of Syracuse, 36 Barb. 526; Newbury v. New York, 1 Sweeny 369; Schiellein v. Kings County, 43 Barb. 491; St. Michael's Church v. Philadelphia, Brightly 21.

The Act of 1841 is remedial, and should be liberally construed. The act refers to all kind of mob violence: Charge of Judge King to Grand Jury of Philadelphia, 4 Penn. Law Jour. 31; St. Michael's Church v. Philadelphia, *supra;* Commissioners of Kensington v. Philadelphia, 1 Harris 78; Hermits of St. Augustine v. Philadelphia, Brightly 116; Davidson v. The Mayor of New York, 2 Robertson 230; Darlington v. The Mayor of New York, 31 N. Y. 173; charge of Judge Jones to Grand Jury of Philadelphia, 3 Penn. Law Jour. 397. The inability of the county authorities to quell the mob, cannot limit the liability of the county. The words of the act cover all cases of loss by any mob or riot, whether large or small. The word "situation," in the statute is intended to mean the place where such property was when it was destroyed. The Act of 1841 has the sanction of the history of

[County of Allegheny *v.* Gibson.]

England, for five hundred years, and of other authority, and was clearly constitutional when passed: Farrar's Report of Dartmouth College Case, pp. 319, 335, 336, 352; Darlington *v.* New York, 31 N. Y. 194; City of Philadelphia *v.* Field, 8 P. F. Smith 320. It was a lawful exercise by the legislature of the police power of the state.

There is no clause in the new constitution or in the schedule which repeals this act. The new constitution was intended to act prospectively only: Trustees of Erie Academy *v.* City of Erie, 7 Casey 316; Cooley's Cons. Lim. *61, 2d ed.; Allbyer *v.* State, 10 Ohio N. S. 588; State *v.* Barbee, 3 Ind. 258; State *v.* Thompson, 2 Kansas 432; State *v.* Maysville, 13 B. Monroe 1; State *v.* Macon County, 41 Mo. 453; Taylor *v.* Mitchell, 7 P. F. Smith 209.

But with what provisions of the constitution is this act inconsistent? For it is not denied that unless it is *plainly inconsistent* with some provision, it is not repealed. It must appear " clearly and indisputably contradictory, * * * and the repugnancy such that the two *cannot be reconciled.*" In re Contested Election of Barber, 5 Norris 400; Perkins *v.* Slack, Id. 279.

The prohibition against special legislation is entirely prospective: Lehigh Iron Co. *v.* Macungie Twp., *supra;* Watson *v.* Chester & Delaware River Railroad Co., 2 Norris, *supra;* Indiana County *v.* Agricultural Society, *supra.*

Mr. Justice PAXSON delivered the opinion of the court, October 6th 1879.

This was one of the cases brought against the county of Allegheny to recover damages for property destroyed by the mob during the riots of 1877. The particular property which is the subject of this suit consisted of sixty barrels of whiskey, belonging to the plaintiffs below. It was wholly destroyed, and its value is not disputed. A verdict and judgment were had in favor of the plaintiffs, and the defendants have removed the record to this court for review. The questions it presents are of grave importance.

The plaintiffs have no common-law remedy. They must recover, if at all, by virtue of Act of May 31st 1841, Pamph. L. 416, which provides, that " in all cases where any dwelling-house or other building or property, real or personal, has been, or shall be destroyed within the county of Philadelphia, in consequence of any mob or riot, it shall be lawful for the person or persons interested in and owning said property to bring suit against said county where said property was situated and being for the recovery of such damages as he or they sustained by reason of the destruction thereof, and the amount which shall be recovered in said action shall be paid out of the county treasury, on warrants drawn by the commissioners thereof, who are hereby required to draw the same as soon as said

damages are finally fixed and ascertained." The provisions of this act were extended to the county of Allegheny by the Act of March 20th 1849, Pamph. L. 184. A somewhat similar act had been in force in Philadelphia since 1836. See Pamph. L. 711, sect. 36. We are charged with no duty of vindicating the wisdom of this legislation. It is proper to say, however, that the principle embodied in the act is not new. As early as 1285, the Parliament of England, by Statute of Winton, or Winchester, 1 Stat. 13 Edw. 1, p. 2, ch. 3 (see 1 Hawk. P. C., ch. 68, sect. 11), provided a remedy against the hundred, county, &c., in which a robbery should take place, for the damages caused thereby, to be recovered by the party robbed in any action against any one or more of the inhabitants. This statute was re-enacted by 28 Edw. 3, ch. 2. Subsequently the Statute 27 Eliz., ch. 13, sect. 2, provided for the assessment of the damages against all the inhabitants of the hundred after a recovery against one or more. Next we have the famous Riot Act of 1 George 1, ch. 5, sect. 1–7, which was passed by reason of the tumult attendant upon the accession of that king to the throne, and which made it a felony, without benefit of clergy, for any persons unlawfully to assemble and demolish any church or dwelling-house. The sixth section of the same act provided that in case such church or dwelling-house should be destroyed, the inhabitants of the hundred in which it was situated should be liable for its value. This was followed by the Act of George 2, ch. 10, sect. 1, and the laws upon this subject were consolidated, in 1827, by 7 and 8 George 4, ch. 31. It will thus be seen that we have imported the principle of the Act of 1841 from that country from whence we derive the great body of our common law. That it was not transplanted at an earlier date is perhaps due to the fact that new countries, sparsely settled, do not early develop riotous tendencies.

Among the numerous questions raised by the assignments of error is that of the constitutionality of the Act of 1841. As this underlies the entire case, it will be first considered. It was pressed with great earnestness upon the argument, the learned and distinguished senior counsel for the plaintiffs in error having devoted his attention exclusively to its consideration, in connection with the inapplicability of the Act of 1841 to the case in hand. It was not contended that the act was unconstitutional at the time of its passage, but that by reason of its inconsistency with the new constitution, it was not preserved by section two of the schedule, and it fell with the adoption of that instrument. This argument is based upon the theory that the constitution was not a mere amendment of the constitution of 1838, but a substitution of a new frame of government, and that it was an abrogation of all acts and authorities derived from the old frame unless preserved by the new. It is true this principle of constitutional law was introduced into this

state by the constitution of 1777, and the Act of Revival of January 28th of that year: 1 Bioren's Laws 429. The preamble to the constitution recites the rights of the people and the oppressions of the crown, and declares that all allegiance and fealty to the said king and his successors are dissolved and at an end, and all power and authority derived from him ceased in these colonies. It is not difficult to understand why this principle should be asserted in a constitution that was the outgrowth of a revolution and of a total severance of all political relations between the colonies and the mother country. In its application to the present times we must not overlook the fact that the conditions are essentially different. The convention of 1873 was not throwing off the yoke of an oppressor and abrogating laws imposed upon the people by a parliament not in sympathy with their views, and in whose deliberations they had no voice. The convention was simply the people of the state, in a representative capacity, it is true, sitting in judgment upon their own acts, altering and modifying their own constitution to suit the progress of the age, and changing their own laws where deemed essential to the welfare of the state. To such a body so constituted no intention to abrogate all that had gone before can be imputed, unless such intention be clearly expressed. I will not stop to discuss the difference between the constitutions of 1838 and 1874 in this respect. It is more seeming than real. Each is an alteration or amendment of the constitution existing at the time, and nothing more. It was provided by the schedule of each, that all laws in force at the time of its adoption, "not inconsistent therewith, and all rights, actions, prosecutions and contracts, shall continue as if this constitution had not been adopted." It is true the schedule of the constitution of 1838 uses the words "as if the said alterations and amendments had not been made," instead of the words "as if this constitution had not been adopted," used in the schedule of 1874. The Act of April 11th 1872, Pamph. L. 53, which called the recent convention into existence, was entitled "An act to provide for calling a convention to amend the constitution." It is true the fourth section of said act authorized the convention to propose to the citizens of the Commonwealth, for their approval or rejection, a new constitution, or amendments to the present one, or specific amendments to be voted for separately. The amendments were radical, yet they were but amendments. A large body of the prior constitution remained. It may be called a new constitution, in the sense in which we call a machine new after it has left the repair shop. Still the fact remains that the constitution is but the prior constitution amended. It matters little how we designate it. The constitution of 1874 was not an abrogation of a former frame of government, as was the constitution of 1777. The frame of government means its form or system. In this sense it remains substantially the same. It is as essentially

[County of Allegheny v. Gibson.]

"a government of the people, by the people, and for the people," as it was before the convention met. It is changed only in matters of detail. Some of the machinery supposed to be worn out has been replaced by new, intended to be of an improved character.

It was urged that the Act of 1841 is inconsistent with the following provisions of the constitution, viz.:

1st. The seventh sect. of art. 3: "The General Assembly shall not pass any local or special law regulating the affairs of counties, cities, townships, wards, boroughs or school districts."

2d. The eighth sect. of the ninth art.: "The debt of any county, city, borough, township, school district or other municipality, or incorporated district (except as herein provided), shall never exceed seven per centum upon the assessed value of the taxable property therein. Nor shall any such municipality or district incur any new debt, or increase its indebtedness to an amount exceeding two per centum upon such assessed valuation of property, without the assent of the electors thereof at a public election, in such manner as shall be provided by law."

3d. The tenth sect. of the ninth art.: "Any county, township, school district or other municipality, incurring any indebtedness, shall, at and before the time of so doing, provide for the collection of an annual tax sufficient to pay the interest and also the principal thereof within thirty years."

4th. The first and second sects. of the ninth art.: "All taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws. But the General Assembly may, by general laws, exempt from taxation public property used for public purposes," &c., and "all laws exempting property from taxation, other than the property above enumerated, shall be void."

In addition, the said act was alleged to be inconsistent with certain other portions of the constitution, the purpose and intent of which are claimed to be to maintain equality in the burdens and impositions necessary to the public welfare, the most important of which are, art. 1, sects. 4, 14 and 23; art. 10, sect. 1; art. 15, sects. 2 and 3; art. 16, sect. 8; art. 17, sects. 1, 3, 7 and 8.

It is not deemed essential to discuss all of these constitutional provisions, or to refer to them *seriatim*. Some of them manifestly have no application to the present contention. Thus we have no question before us as to the extent of the debt of the county of Allegheny, or of the assessed value of its property. This record furnishes us no information which would enable us to form an intelligent opinion, as to whether the judgment below so increased the debt of the county as to bring it within the prohibition of the constitution, and if it did, it would be a novel defence to an action at

law for the county to plead that it already was in debt to the extent of the constitutional limitation. How far such a plea would avail in restraint of an execution, I need not stop to discuss. It is clearly no reason why a judgment should not be recovered, and I apprehend would be a frail shelter for municipal corporations from the consequences of their tortious or negligent acts. The tenth sect. of the ninth art. refers to the contracting of a debt or the incurring of an indebtedness by virtue of a contract by municipalities when it provides for the levying of an annual tax, sufficient to pay the interest and the principal within thirty years.

The failure to levy such a tax by the municipality, is no reason why a party injured by its negligence should not sue therefor and recover his judgment. The argument is, that there can be no liability on the part of a municipality, because the amount thereof being unknown prior to the destruction of the property, it is impossible to comply with the mandate of the tenth sect. in providing an annual tax to meet it. The eighth and tenth sects. were not intended to make corporations dishonest, nor to shield them from the consequences of their own wrongful or negligent acts. Further than this it is not necessary for us now to go. The delicate questions which will probably arise under these sections will be decided when they are legitimately before us.

It may be conceded that if the Act of 1841 had been passed subsequent to the adoption of the constitution, it would have been " a local or special law regulating the affairs of counties, cities, townships, wards, boroughs or school districts," and, therefore, within its prohibition. But such prohibition is prospective. Its language is, " the General Assembly shall not pass." Hence, it is plain the Act of 1841 is not affected by the prohibition; the only question is, was it repealed? The act was well known at the time of the convention. It had been upon the statute books since 1841, and had been made especially prominent by reason of the Philadelphia riots of 1844. The convention might have repealed it in express terms. Yet there is no direct repeal in either the constitution or schedule. If repealed at all, it is by implication only, and fell with the adoption of the constitution with the body of the old laws that were not essential to preserve vested rights and existing institutions necessary to the public welfare. This is not an entirely new question. A somewhat similar one was considered in the Trustees of the Erie Academy *v.* The City of Erie, 7 Casey 515. In 1849, the town councils of the borough of Erie passed an ordinance for the paving of certain streets. Before the paving was done the legislature changed the government of the borough into that of a city, and it was argued that the ordinance fell. This court held, sustaining the court below, that the ordinance of the borough continued in force notwithstanding the change in the frame of its government. It was said

[County of Allegheny v. Gibson.]

by Strong, J., " There is no doctrine better settled than that a change in the form of government of a community does not *ipso facto* abrogate pre-existing laws, either written or unwritten. This is true in regard to what is strictly municipal law, even when the change is by conquest. The Act of Assembly converting a borough into a city did not, therefore, of itself, and in the absence of express provisions to that effect, either repeal former Acts of Assembly relative to the borough, or annul existing ordinances. It was solely a change of the organic law for the future, and left unaffected the borough statutes, precisely as a change of a state constitution leaves undisturbed all prior Acts of Assembly." This case was prior to the present constitution, and has no direct reference to it. We have, however, several cases since its adoption, in which the very point in controversy was before us. The first was the City of Pittsburgh *v.* Kitty Roup, 1 W. N. C. 254, which was an appeal from a preliminary injunction restraining the city of Pittsburgh from collecting the full rate of taxation upon plaintiff's real estate, which had been assessed as rural, under a special local act passed in 1868, and under which act only two-thirds of the city rates could be assessed and levied. Notwithstanding this act, the city councils attempted to assess and collect the full rate of city taxation from the plaintiff, claiming, that under art. 9 of the constitution, which provides that " all taxes shall be uniform," the special act classifying plaintiff's property as rural was inoperative; in other words, that it was repealed by the new constitution. The court below thought otherwise, and granted the injunction, which action was sustained by this court. This was followed by The Lehigh Iron Co. *v.* Lower Macungie Township, 31 P. F. Smith 482, where art. 7 was again under consideration. It was said by Agnew, C. J.: " In view of the wide and extended effects of an immediate repeal *ipso facto* by the adoption of the new constitution, it behooves us to be careful in the interpretation of the sections mentioned. Upon all the consideration we can give to this subject, after a very careful argument to assist us, we are of opinion that sect. 1 of art. 9 is not immediately operative, but was intended by the convention to be mandatory upon the legislature to enact laws framed upon its special intent, and to repeal all laws inconsistent therewith, leaving the legislature, in the exercise of wise and sound discretion, to time the repeal, and after proper general laws have been passed. Any other interpretation would lead to most ruinous results." In Wattson *v.* Chester and Delaware River Railroad Co., 2 Norris 254, it was held, Chief Justice Agnew delivering the opinion of the court, that " the provisions of the new constitution, contained in sect. 23 of art. 3, that 'the power to change the venue in civil and criminal cases shall be vested in the courts, to be exercised in such manner as shall be provided by law,' was not immediately operative *eo instante* the constitution was

[County of Allegheny *v.* Gibson.]

adopted so as to defeat existing laws." The same doctrine was asserted by this court in the later case of Indiana County *v.* The Agricultural Society of Indiana County, 4 Norris 357. The Act of March 29th 1851 enables county agricultural societies to receive from the treasurer of the county a certain bounty. Art. 9, sect. 7, of the constitution of 1873, prohibits the General Assembly authorizing any county to appropriate money for, or loan its credit to any association, corporation or individual. It was held, recognising and following Lehigh Iron Co. *v.* Lower Macungie Township, *supra*, that the prohibition of the constitution was wholly prospective, and did not repeal the Act of 1851. Even stronger, if possible, is the case of Perkins *v.* Slack, 5 Norris 270, in which it was held by this court that sect. 2, art. 15 of the constitution, which provides that "no debt shall be contracted or liability incurred by any building commission except in pursuance of an appropriation previously made by the municipal government," did not affect the Act of 5th August 1870, Pamph. L. of 1871, p. 1548, creating the building commission of the city of Philadelphia, so as to prevent said commission making requisitions at pleasure upon the councils of said city for means to continue the erection of the city buildings at Broad and Market streets. Commonwealth *ex rel.* Chase *v.* Harding *et al.*, 6 Norris 343, is the last of this series of cases. It was there held that sect. 5 of art. 5 of the constitution, which declares, that "whenever a county shall contain forty thousand inhabitants, it shall constitute a separate judicial district, and shall elect one judge learned in the law," is not self-executing, but merely indicates a certain basis upon which, at the proper time, and in the proper manner, judicial districts are to be created by the legislature.

It was contended, however, that the cases cited are inapplicable to the one in hand, for the reason that the special laws referred to therein were necessary to preserve existing institutions and regulations essential to the public interests in the localities affected; whereas the Act of 1841, is not necessary for any such purpose; that it preserved no existing institutions; that the occurrence of a mob and the destruction of property thereby was a mere *potentia remotissima*, and the act therefore fell. This is assuming the very point in controversy. If, as we are bound to presume, the Act of 1841 was a necessary police regulation at the time of its passage, we must regard it as essential now until the contrary is made to appear. Just here the ingenious and able argument for the plaintiffs in error fails. No reason has been shown why the act in question is not now as essential to the order and good government of the cities affected by it as it was at the time of its passage. Regarding it as a remedial statute, the very riots which are the subject of the present contention furnish a potent argument to show that it has not outlived its usefulness. Its application to

[County of Allegheny *v.* Gibson.]

the Philadelphia riots of 1844, showed that at that time it was a much needed police regulation. It enabled the owners of property destroyed to recover its value; at the same time it inculcated a lesson of inestimable value to the municipal authorities and tax-payers of that city, the good results of which are seen in a well trained police force, and a freedom from mob violence that is exceptional. The increased growth of the cities of Philadelphia and Pittsburgh, not only in area and population, but also in the materials and elements out of which spring riots and disorders, tends to show that the Act of 1841 is even more essential now than at any prior period. In our view it certainly appears as important to the public interest in the locality affected as a law *giving* to the Indiana County Agricultural Society a hundred dollars per year.

The late convention had in it some of the ablest constitutional lawyers in the state, among whom were two ex-chief justices of this court. Whenever that body desired the constitution to act retrospectively, and repeal existing laws, they knew how to do it. Thus, in sect. 21st of art. 3, which restricts the power of the General Assembly to pass laws limiting the time in which suits may be brought against corporations for injuries to persons or property, it adds: "And such acts now existing are avoided." Sect. 22 of the same article, providing against investment by trustees, exec-utors and guardians, in the bonds or stock of any private corpo-rations, adds: "And such acts now existing are avoided, saving investments heretofore made." In art. 5, sect. 5, regulating judicial districts, it says: "The office of associate judge, not learned in the law, is abolished in counties forming separate dis-tricts." Sect. 12 of the same article provides: "In Philadelphia the office of alderman is abolished." In sect. 21 of the same article: "The Court of Nisi Prius is hereby abolished." In art. 9, sect. 2: "All laws exempting property from taxation other than the property above enumerated, shall be void." Sect. 1 of art. 16: "All existing charters or grants of special or exclusive privileges, under which a bona fide organization shall not have taken place and business commenced in good faith at the time of the adoption of this constitution, shall thereafter have no validity." Then we have the exception in the 7th section of the 1st article, giving power to the legislature to repeal special and local acts. This, as was said by AGNEW, C. J., in Lehigh Iron Co. *v.* Macungie Town-ship, *supra*, at p. 486, "strongly indicates the intent that such local or special acts should remain, until legislation had been adopted to harmonize these local and special provisions with the general laws so adopted." I may well stop here with this branch of the case. The principle that local or special laws were not *ipso facto* repealed by the adoption of the present constitution is too firmly established to be overturned or shaken. The cases cited, settle the broad principle that the sections of the constitution

[County of Allegheny v. Gibson.]

referred to, are "not immediately operative," but are merely mandatory upon the legislature to repeal such local or special laws after protecting such interests as need preservation by the passage of general laws. The legislature may, and doubtless will, at the proper time, legislate upon this subject. It may repeal the law, or, in view of the rapid growth of other towns and cities, and the increasing tendency to mob violence growing out of social, political and labor disturbances, may extend it over the state by a general law. I notice that the Act of the 15th of April 1863, Pamph L. 490, extends it to Northampton county. There may be acts extending it to other counties which have escaped my notice. Until such time as the legislature shall declare its will, the Act of 1841, under all our decisions, is entitled to stand.

Just here we are met with the proposition, that, if the Act of 1841 was not repealed by the adoption of the present constitution by reason of its inconsistency therewith, yet that said act is inapplicable to the case in hand; that the facts as admitted and offered to be proved were not within the intent and purpose of the act. It was urged in support of this view that the county of Allegheny has not a concentrated police force ; that its townships and boroughs are disconnected municipalities, having no combined magistracy, no organized and consolidated constabulary, and no common head to govern and direct; that the riot, by means of which the property of plaintiffs was destroyed, was the result of a labor strike extending over many states ; that at the time of the passage of the Act of 1841 our present great railroad system had no existence, and that it could not have been intended by the framers of said act that it should apply to such unlooked for and exceptional circumstances. A number of authorities were cited to show that in expounding a law, the reason and spirit and the intention thereof should be considered. No fault is found with the authorities. They are undoubted law, but their application to the facts of this case is not clear. We have here a statute that is free from ambiguity. In such case the intention of the legislature is to be collected from the words of the act. This is a primary rule in the construction of statutes : Dwarris 164. The best exponents of the legislative mind are the words of the statute where they are free from ambiguity : Commonwealth v. Pennsylvania Ins. Co., 1 Harris 165; Bradbury v. Wagenhorst, 4 P. F. Smith 180. Although the spirit of an instrument is to be regarded no less than its letter, yet the spirit is to be collected from the letter. It would be dangerous in the extreme to infer from extrinsic circumstances, that a case for which the words expressly provide shall be exempted from their operation: Potter's Dwarris 182 ; Story Confl. Laws 10. Of course the framers of the Act of 1841 could not have had this particular riot in view at the time of its passage, nor is it likely they contemplated the Philadelphia riots of 1844. But they did know, if they

[County of Allegheny v. Gibson.]

had ordinary intelligence, and that is to be presumed, that riots had occurred in the past in large cities, and were liable to occur in the future, of a character so serious as to shake the social fabric to its foundations. The act was accordingly framed broad enough to embrace any and all such disturbances for the future. How then can we say, that the riots of 1877 were not within its spirit? Is it because of the size of the mob? Yet it did not compare with the London riots of 1780, the Philadelphia riots of 1844, or the New York riots of 1863. Is it because the mob was composed of strikers, and the object of their vengence, a railroad corporation? No such exceptions are found in the statute, and to write them in now to meet the exigencies of this case would be judicial *ex post facto* legislation of the most objectionable character. The argument upon this branch of the case has failed to point out just what kind of riots were contemplated by the framers of the Act of 1841. We are left to infer, however, that the Act was intended to apply only to riots where the number engaged is small and the damage inconsiderable. But where is the line to be drawn, and by whom? Is the act to apply to mobs of ten persons and not to those of one hundred? Or to those of one hundred, and not to those of one thousand? Is compensation to made for a broken window and denied where the entire building is sacked and burned? We have been furnished with no answer to these grave questions which confront us instantly upon any attempt to give to the Act of 1841 the narrow construction claimed for it.

Having disposed of these preliminary questions, we will now consider some of the incidents of the trial of the case in the court below as developed by the assignments of error.

It is said that the plaintiffs did not prove any notice to a constable, alderman, or a justice of the peace of the ward, borough or township, or to the sheriff of the county in which their property was situated, of any intent to destroy their property, or of the fact that a mob had been collected for such purpose. Nor did they prove that sufficient time had not intervened to enable them to do so; and that, in the absence of such proof, it was error in the court below to charge the jury, that under all the evidence in the case, if believed by them, the plaintiffs were entitled to recover.

It is provided by the eighth section of the Act of 1841, that " no person or persons shall be entitled to the benefits of this act if it shall appear that the destruction of his or their property was caused by his or their illegal or improper conduct, nor unless it be made to appear that he or they, upon the knowledge had of the intention or attempt to destroy his or their property, or to collect a mob for such purpose, and sufficient time intervening, gave notice thereof to a constable, alderman or justice of the peace of the ward, borough or township in which said property may be situated, or to the sheriff of the said county, and it shall be the duty of the said

[County of Allegheny *v.* Gibson.]

sheriff, alderman, constable or justice, upon the receipt of such notice, to take all legal means to protect said property, so attacked or threatened," &c.

It is manifest that a property-owner cannot be in default for want of having given notice under this act, unless, first, he had knowledge of an intention on the part of the mob to destroy his property; and second, that there was sufficient time intervening to give the notice contemplated by said act. It is equally clear that the object of such notice is to inform the proper officer, so that the property may be protected. These positions are fully sustained by authority, both in this state and in New York, where a statute similar to the Act of 1841 exists. In Donoghue *v.* The County of Philadelphia, 2 Barr 230, it was said by Mr. Justice SERGEANT: "The next question is as to the notice. The Act of Assembly requires that notice be given to the sheriff, alderman, justice or constable, where there is sufficient time intervening. But in what cases is the party required, by the act, to give this notice? When he has knowledge of the intention or attempt to destroy his property, or to collect a mob for such purpose. It would be strange to require him to give notice when he has not such knowledge, and, therefore, in such case, he is not debarred from his remedy, though he has not given such notice." In St. Michael's Church *v.* County of Philadelphia, Bright. Rep. 121, the defendant offered to prove that several days before the property was burned, notice was given to two of the trustees of the church of such intention, and that they had neglected to give any notice to the sheriff. ROGERS, J., rejected the offer because the knowledge was not had by, or notice given to the trustees in their corporate and official capacity. It would be equally unnecessary to give notice to the sheriff or other officer where he already had knowledge of the facts, or such notice would be unavailing for the purpose of protection: Newberry *v.* New York, 1 Sweeney 369; Schiellein *v.* Kings County, 43 Barb. 491. That the sheriff of Allegheny county had knowledge of the mob and of their intention, clearly appears from the testimony of that officer, offered by the defendants themselves. The sheriff had visited the mob on the evenings of July 19th, 20th and 21st. When he saw the mob on the evening of the 19th they had commenced their work by the forcible seizure and retention of possession of the property of the railroad company. When he ordered them to disperse, they refused to do so, and told him "they were going to hold that road, and that they were going to wade in blood to their waists." The sheriff adds: The mob remained in possession of the road and increased in numbers, and that continued until Saturday evening. Mr. D. M. Watt was examined on behalf of the plaintiffs, and said that he called upon the sheriff, in company with Hon. John Scott, of counsel for the company, on Thursday night, July 19th, and informed that officer, "that the

[County of Allegheny *v.* Gibson.]

property of the company was in possession of a mob at Twenty-eighth street, and that we were unable to move our trains or get possession of the switches, and that we desired protection. Mr. Scott called upon him, on the part of the company, for a proper force to protect the property of the company, and to protect the company in the movement of their business." No destruction of property took place until after five o'clock P. M. of July 21st. It is manifest, therefore, the objection that proper notice was not given, under the Act of 1841, is without foundation.

It was further objected that the plaintiffs' bailees, the Pennsylvania Railroad Company, were guilty of improper conduct, within the meaning of the Act of 1841. The eighth section of that act provides that no "person * * * shall be entitled to the benefit of this act if it shall appear that the destruction of his property was caused by his * * * illegal or improper conduct." It was contended that by using the words "illegal or improper conduct," the law makes a distinction between conduct which is actually illegal and that which, although not technically unlawful, may be still improper. Just what is "improper conduct," within the meaning of the Act of 1841, is a nice question. We are not without rulings in our own state and elsewhere, where similar statutes exist, that may throw some light on the question. In Donoghue *v.* Philadelphia, *supra*, Chief Justice GIBSON placed his rulings on the legal rights of the owners of the property, and when it was urged that the introduction of armed men into the house, under the excitement existing at the time of the firing upon the mob, was injudicious, he replied, in his charge to the jury: "That it was justifiable to introduce men and arms into the house as the exercise of a freeman's privilege, whether there was an apprehension of danger or not; and that if the mob was not fired on until after it had begun the attack, this part of the defence had failed." To the same effect are the rulings of Mr. Justice ROGERS, in The Hermits of St. Augustine *v.* Philadelphia County, Brightly 116, and St. Michael's Church *v.* Philadelphia County, Id. 121. It would seem to be clear that in order to defeat a recovery upon this ground, for property destroyed by a mob, the "improper conduct" must have been the proximate cause of the destruction. "Was caused" is the language of the act. In Lavery *v.* Philadelphia County, 2 Barr 233, it was said by Mr. Justice SERGEANT: "In order to debar a person from the remedy provided by the Act of Assembly of 31st of May 1841, it must be made to appear, in the words of the act, that the destruction of his property was caused by his illegal or improper conduct." In the state of New York, the statute reads, that "no person shall be entitled to recover, if it shall appear upon the trial thereof that such destruction was occasioned or in any manner aided, sanctioned or permitted by the carelessness or negligence of such person." Ely *v.* The County of Niagara, 36

[County of Allegheny *v.* Gibson.]

N. Y. 167, was decided upon this act. It was an action for the destruction of a dwelling-house. The county, in the court below, offered to prove that the house was a notorious bawdy-house, kept by the plaintiff as such; that it was the resort of prostitutes, thieves, and murderers; that prior to its destruction a policeman of the town was found murdered in front of the house, and that he was so murdered by some one who made the house a resort, and during a drunken debauch therein; that when this fact became known, the citizens were so enraged that in a body they assembled and destroyed the house. The court below rejected the offer, and this ruling was affirmed, both in the Supreme Court and the Court of Appeals, and it was held that the act of the plaintiff, which would prevent her recovery, must be the proximate cause, and the loss the natural and necessary consequence. See also Blodgett *v.* County of Syracuse, 36 Barb. 526. It has never yet been held that the assertion of a legal right in a legal manner, in pursuit of a legal and ordinary business, was such "improper conduct" as would prevent the owner of property destroyed by a mob, from recovering its value, under the Act of 1841, or similar statutes. It is not pretended that the plaintiffs did any improper act. They were hundreds of miles away, and knew nothing of the destruction of their property until it was accomplished. But it is said they are responsible for the act of the Pennsylvania Railroad Company, their bailees. Conceding this to be so for the purposes of this case, what act of the company was illegal or improper, within the meaning of the statute? It was said that the mob was fired upon. Granted. But by whom? Not by the Pennsylvania Railroad Company, but by the military sent there by the governor of the state, in response to a telegram from the sheriff of Allegheny county, asking for troops to assist in quelling the riot. Whether the firing was judicious under the circumstances, we are not called upon to say. It is no part of this case. It is enough for us to know that, whether judicious or otherwise, it was an act for which neither the company nor the plaintiffs are responsible. But it is said the company reduced the wages of their employees, and in the face of the dissatisfaction produced thereby, endeavored to move their trains in opposition to the will of the mob. A more untenable position than this could not well be imagined. For some days cars loaded with freight from distant points had been accumulating in the yards at Pittsburgh, by reason of the strike and the refusal of the strikers to allow them to be moved forward to their destination. The result was a blockade, paralyzing the business of the country, upon this, one of its greatest arteries of commerce. In such a vast collection of freight there must have been much of a perishable nature. It was the duty, involving a legal responsibility on the part of the company, to forward it. In doing so they were but asserting a legal right and performing a legal

[County of Allegheny *v.* Gibson.]

duty which they owed to shippers and consignees. Their action was neither illegal nor improper, under the Act of 1841.

It was further objected that, " where an insurrection is by reason of its nature and extent beyond the power of the local authorities to anticipate or subdue, a county cannot be held liable for the loss of property destroyed during and in consequence of it." This proposition is a crystallization of the offers of evidence contained in the fourth and fifth assignments of error. To which may be added the point, pressed upon the argument, that after the appearance of the military of the state upon the scene, in obedience to the order of the executive authority, the responsibility of the county of Allegheny ceased. The word " insurrection," in this connection, is not applicable. The meaning of it is: " A rising against civil or political authority; the open and active opposition of a number of persons to the execution of law in a city or state; a rebellion; a revolt:" Worcester. There was nothing of the kind here. It was a mob, and nothing more. It has never been held that the responsibility of a city or county for the violence of a mob depends upon its size or formidable character, or that the failure of the civil authorities to suppress it, or that their calling upon the military authorities for aid relieved them from liability. History furnishes three notable instances which go far to establish the contrary view. The first one to which I refer was the " No Popery" riots of London, in June 1780. This was the most extensive riot of which we have any record. For several days, the mob, numbering sixty thousand persons, had complete control of London. The authorities were paralyzed. The immediate cause of the tumult was the presentation of a petition by Lord George Gordon to Parliament for the repeal of Sir George Saville's Act for the relief of Catholics. The riot commenced on June 2d, and continued until June 8th. It was not confined to the city of London, but spread throughout the kingdom. The whole city was in a state of anarchy. On the evening of June 6th, thirty-six different fires were raging, caused by the mob. The famous prisons of the Fleet and King's Bench were fired, and the prisoners released; all the public buildings threatened; many private houses sacked, including that of the chief magistrate of the highest criminal court in the kingdom, Lord Mansfield, whose furniture, pictures, books and papers were all burned. More than four hundred and fifty persons were killed. It was only by the vigorous use of the military power that the mob was finally subdued. The courts of England held that the loss fell within the statute, and the respective hundreds were liable. Another instance is the Philadelphia riots of 1844. Here, again, the civil power was wholly inadequate to suppress the mob, and it was only put down at last by the stern use and display of the military arm. Said the late Judge King, in his charge to the grand jury: " Our city during these scenes of violence has

9 NORRIS—27

[County of Allegheny *v.* Gibson.]

exhibited the appearance of a town of war, instead of the pacific seat of science and literature, of commerce and the industrial arts.'' The amount of property destroyed was large, for all of which, the county was held liable, under the Act of 1841. Later still, we have the draft riots of New York in 1863, when an entire army corps was withdrawn from the front, where it was sorely needed, to hold in check the rebellious elements of that city. In numerous cases the Court of Errors and Appeals held the city liable: Newberry *v.* New York, 1 Sweeney 369; Davidson *v.* The Mayor, 2 Robinson 230; Darlington *v.* The Same, 34 N. Y. 164. Some idea of the extent of the damages caused by the mob during this riot, may be inferred from the fact, that upon the argument of the case last cited, counsel representing the plaintiffs in nine hundred and fifty other cases were heard. It may be that the point now under discussion, was not made in any of the suits growing out of the three great riots above referred to. I do not find any trace that it was. In view of the hundreds of cases, of the large interests involved, of the number of eminent counsel employed, not only in England, but in New York, and in this state, the fact that no such point has ever before been made, is persuasive evidence that there is nothing in it. This, however, is not conclusive, and, in view of the gravity of the issue involved, we will consider it as a new question.

The Act of 1841 is both a remedial and penal statute. It is remedial, so far as it provides for compensation to the person whose property has been destroyed, and penal, so far as it throws the burden of that compensation upon the municipality within whose borders the destruction took place. It is but an extension of the ancient English law, which made the inhabitants of the respective hundreds responsible for robberies committed therein. Formerly, as we have seen, a person robbed had his remedy against any inhabitant of the hundred; that is to say, the inhabitants were jointly and severally liable. Then the law was so changed, that damages recovered against an individual could be assessed against all the inhabitants, so as to compel contribution. Afterwards it was still further modified so as to give the right of action against the hundred. The principle upon which this legislation rested was that every political subdivision of the state should be responsible for the public peace and the preservation of private property; and that this end could be best subserved by making each individual member of the community surety for the good behavior of his neighbor and for that of each stranger temporarily sojourning among them. The effect was to make each citizen a detective, and on the alert to prevent as well as to detect and punish crime. There was no exception in favor of robberies committed by overwhelming numbers, and by such a show of force as to overawe and overpower the limited constabulary of the hundred, or such as were committed by

[County of Allegheny *v.* Gibson.]

strangers. In either case the hundred was liable to the person robbed, however difficult or impossible it might be for the inhabitants to anticipate or prevent it. It was evidently a police regulation, based upon grounds of public policy, and enforced without regard to the hardships of particular cases. Our Act of 1841 is also a police regulation, and rests upon like grounds of policy. Under our political system the state grants a portion of its sovereignty to certain municipalities. It clothes them with certain of its powers, and exacts from them in return the performance of certain duties. Among the powers granted is that of maintaining a police force. Among the duties exacted is that of preserving the public peace. There is an implied contract between the state and every municipality, upon which it bestows a portion of its sovereignty, that such municipality shall preserve the public peace, and maintain good order within its borders. The state lends its aid when the local authorities are overborne, and a call for assistance is made in the manner pointed out by law. But it is entirely within the power of the sovereign to make such communities responsible for the preservation of order. The privileges conferred must be taken with such burdens as the law-making power chooses to annex thereto, and where liability for mob violence is imposed without qualification, it is not within the scope of judicial power to write exceptions into the law which the legislature, in its wisdom, has not seen proper to place there. It may seem a harsh rule to hold a community responsible for the effects of mob violence, which apparently, at least, they had no power to prevent; yet not more so than to hold every inhabitant of the English hundred liable for a robbery of which he knew nothing, and had no means of arresting.

In both cases it is a police regulation. It is based upon the theory, that, with proper vigilance, the act might and ought to have been prevented. That this is true with mobs, as a general rule, is well known. A mob is always cowardly, and usually of slow growth. It increases in size and courage just in proportion as the authorities evince hesitation or timidity. That this hesitation is often the result of indifference, if not of open sympathy, is unfortunately too true. It is rare that a mob is without a large body of sympathizers at its commencement. This is because its fury is generally directed against an unpopular object. In populous communities, especially in large cities, there are always antagonisms of race, religion, politics or social condition, which enable the demagogue to fan the fires of popular discontent, and incite the disorderly to acts of violence. It is because of this sympathetic feeling that mobs are often enabled to get the mastery, the fact being overlooked that a mob, when once aroused and maddened by success, becomes, like a wild beast, dangerous alike to friend and foe. There is nothing upon the face of this record to show that the Pittsburgh riots of 1877 were an exception to this rule. We

[County of Allegheny *v.* Gibson.]

see no evidence of any serious attempt upon the part of the local authorities to suppress it at the time of its commencement.    A feeble attempt was made by the sheriff, resulting in the enrolment of some half-dozen deputies.    But there was no proclamation calling upon the body of the county to come to his assistance, in preserving the public peace.    No one doubts at this day that if a proper effort had been made at the proper time, the mob could have been held in check.    No one doubts that it would have been, had the citizens of the county realized that they were responsible for the loss.    But this Act of Assembly, folded away among the pamphlet laws, was probably forgotten or overlooked, even by those who knew of its existence.    In the end, the mob that had defied the military power was put down in the main by the civil authorities, after the citizens had been aroused by a sense of common danger.    The law will not tolerate the spectacle of a great city looking on with indifference, while property to the value of millions is being destroyed by a mob.    To prevent just such occurrences was one of the objects of the Act of 1841.    The fact that the state, when called upon, rendered its assistance, and sent a portion of its military to the scene, did not absolve the county from its implied obligation to preserve the peace, nor from its responsibility for a neglect of that duty.    Were it otherwise, it might be to the interest of a municipality to increase the size of the mob.

The right of the plaintiffs to recover is further resisted upon the ground, 1. That being non-residents, they are not entitled to the benefit of the Act of 1841 ; and 2. That the property having been shipped at Cincinnati for Philadelphia, and destroyed on the cars *en route*, was not "situate" in the county defendant, within the meaning of the act.    The first ground of objection appears to be based upon a mistake of fact.    The "history of the case," furnished by the defendant, asserts that the plaintiffs are citizens of Philadelphia.    I notice, however, that in the case of Webb & Son, argued with this, the plaintiffs are citizens of Baltimore, Maryland.    As therefore the point must be met in that case, I will dispose of it here.

No authority has been cited, nor has any sufficient reason been shown, why the act should not apply to the property of non-residents.    It is broad enough in its terms to cover it.    "In all cases," is the language of the statute.    There is nothing in the spirit or reason of the act to discriminate against non-residents.    The stranger robbed had his remedy against the hundred, as well as if he had been an inhabitant thereof.    Our entire system of law, for the protection of person and property, places the citizen and stranger upon the same plane of security.    It has never yet said to a mob : You must not touch the property of A., because he is a citizen of the state, but you may work your will upon the property of B., because he is a non-resident.    On the contrary, it

protects the property of the stranger stopping for a single night at a hotel, so far as he brings it with him, precisely as it protects that of a lifelong citizen. Any other rule would be churlish and inhospitable, and if successfully asserted, would very materially lessen the business of the state, by diverting passengers and freight into channels where a more liberal rule of law prevailed.

Was the property situated within the county? Strictly speaking, personal property cannot be said to have a *situs*. It is situated wherever it may happen to be for the time being. This is all that the word means in the Act of Assembly, as applicable to *personal* property of this description. The act, as before stated, is remedial as to the sufferer. Similar acts have been invariably so regarded, and have been construed liberally. In Hyde v. Cogan, 2 Doug. 699, which was one of the cases growing out of the Lord George Gordon riots of 1780, the statute was largely considered, and all the judges, except Lord Mansfield, gave an opinion. Said Willes, J.: "The sixth clause I rather consider as remedial. It may be said to be penal as to the hundred, but is certainly remedial as to the sufferer." Ashhurst, J.: "The purpose of this act is remedial, and therefore it ought to receive a liberal construction." Buller, J.: "The statute is so penned that the words might possibly admit of two constructions, and therefore it is material to consider whether it is penal or remedial, because there is a well-known difference in the rule of construction, as applied to laws of the one sort and of the other. When they are remedial, the interpretation is to be liberal, so as best to apply to the end. * * * If the clause upon which this case arises (6) is remedial, which I think it is, the most extensive sense must prevail, and it was so held in both cases cited at bar (Radcliffe v. Eden; Wilmot v. Horton). But, independent of authority, as the clause is remedial, it must receive a liberal construction." It was accordingly held in that case that, under the statute of George 1, commonly called the Riot Act—which made it felony without benefit of clergy for any persons unlawfully, riotously and tumultuously assembled together, to the disturbance of the public peace, unlawfully and with force to demolish or pull down any church or chapel, or any building for religious worship, &c.—if any persons riotously assembled, in part demolish and pull down a dwelling-house, and at the same time destroy goods and furniture in the house, although such goods and furniture were not destroyed by means of the pulling down of the house, the hundred is liable, under the above statute, for the destruction of the furniture, as well as of the house. And in Donoghue v. The City of Philadelphia, *supra*, an accidental destruction by fire, communicated from a building fired by a mob, was held to be within the act. In Commissioners of Kensington v. The County of Philadelphia, 1 Harris 76, it was held that a municipal corporation is included within the term person or persons, autho-

[County of Allegheny *v.* Gibson.]

rized by the Act of 1841, to bring suit for injury to its property by a mob. Of a similar statute in New York, the Supreme Court of that state, in Schiellein *v.* Kings County, *supra,* said: "The statute must receive a reasonable and liberal construction." And of our own statute, Justice ROGERS said, at Nisi Prius, in The Hermits of St. Augustine *v.* County of Philadelphia, *supra:* "The Act of Assembly has been carefully drawn, and is wise, just and beneficial in its character. * * * If the act is always rigidly enforced when violated, the effect will be found highly beneficial." It requires no strain to bring the property in question within the letter and spirit of the Act of 1841. On the contrary, it would require a wrenching of the law to hold that the act did not apply.

The learned judge was right in rejecting the offers of evidence embraced in the second, third and fourth specifications. It is manifest that if received they would not have amounted to a defence. The offers were also vague, involving conclusions rather than facts. An offer to show that the mob was beyond the control of the civil authorities was incomplete, in the absence of any attempt to prove its numbers or size, or that an effort had been made to suppress it. An examination of the bill of exceptions shows that while the learned judge rejected the offers as a whole, he nevertheless allowed the witnesses to proceed, with the understanding that they were to be checked, if necessary. In this way the defendants got before the jury a very full history of the riots, which was not contradicted in its essential features.

Upon all the points presented, the law is against the county. The judgment, therefore, must be affirmed.