CITY OF CHICAGO v. PENNSYLVANIA CO.*

(Circuit Court of Appeals, Seventh Circuit. February 28, 1902.)

No. 735.

1. MUNICIPAL CORPORATIONS—LIABILITY FOR PROPERTY DESTROYED BY MOB.

A city may be held liable for the destruction or injury of property, in consequence of a mob or riot therein, where such liability is imposed by statute; and it is no defense to an action for its enforcement that the city exercised all its power to prevent the loss, or that the state and federal governments were also engaged in protecting the property.

2. SAME—ACTION FOR DAMAGES—EVIDENCE CONSIDERED.

Evidence examined, and held to sustain the finding of a jury that property was destroyed in consequence of a mob during the railway strike of 1894 in Chicago, within the meaning of the Illinois statute, so as to render the city liable therefor.

3. SAME—EVIDENCE.

In an action against a city to recover for property destroyed and injured in consequence of a mob or riot, a proclamation issued by the mayor calling for troops to suppress the riot, telegrams sent by him to the governor, and similar official acts are admissible in evidence to show the conditions existing at the time the property was destroyed.

4. BAILMENT—INTEREST OF BAILEE—RIGHT TO SUE FOR INJURY OF PROPERTY.

A railroad company has such property in cars which it holds under lease, and in cars of other companies temporarily in its possession and use as bailee as a common carrier, as will support an action for their wrongful injury or destruction.

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

T. J. Sutherland, for plaintiff in error.

George Willard, for defendant in error.

Before JENKINS and GROSSCUP, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge. This is an action at law, brought by the Pennsylvania Company against the city of Chicago, to recover damages caused to its property in that city, growing out of the riots there in July, 1894. The declaration sets out that on July 6, 1894, the plaintiff was the owner of certain railroad property and equipments within the city, giving a full description, and that in consequence of a certain mob or mobs, riot or riots, each of which was then and there composed of 12 or more persons within the territorial limits of said city, a large amount of such property and equipment was injured and destroyed, including seven box cars of the value of $3,745, six stock cars of the value of $5,000, four box cars of the value of $1,000, one refrigerator car of the value of $1,000, injured to the extent of $140. Ten of said stock cars of the value of $3,000 were injured to the extent of $1,400. Thirteen of said box cars of the value of $3,500 were injured to the extent of $1,820. Various other allegations are contained in the declaration, alleging damage by fire

* Rehearing denied May 7, 1902.

¶ 1. See Counties, vol. 13, Cent. Dig. § 213; Municipal Corporations, vol. 36, Cent. Dig. § 1558.

and otherwise to buildings, cross-ties, targets, yardmaster's office, passenger station at or near Fifty-First street, milk trains, railroad track of the length of 25 miles and of the value of $25,000 obstructed by derailment of cars, etc., and injured to the extent of $600. One lot of merchandise of the value of $10,000 is alleged to have been injured to the extent of $5,000. A bill of particulars was filed with the declaration, giving in detail the property injured and the extent and place of loss, which foots up at the sum of $16,010.44; and the plaintiff claims damages in the sum of $30,000. The statute of the state of Illinois under which the action is brought, and without which no action could be maintained, is substantially as follows:

"Whenever any building or other real or personal property, except property in transit, shall be destroyed or injured in consequence of any mob or riot composed of twelve or more persons, the city, or if not in a city, then the county in which such property was destroyed, shall be liable to an action by or in behalf of the party whose property was thus destroyed or injured, for three-fourths of the damages sustained by reason thereof.

"No person or incorporation shall be entitled to recover in any such action if it shall appear on the trial thereof that such destruction or injury of property was occasioned, or in any way aided, sanctioned, or permitted by the carelessness, neglect, or wrongful act of such person or corporation; nor shall any person or corporation be entitled to recover any damages for any destruction or injury of property as aforesaid, unless such party shall have used all reasonable diligence to prevent such damage.

"No action shall be maintained under the provisions of this act, by any person or corporation whose property shall have been destroyed or injured as aforesaid, unless notice of claim for damages be presented to such city or county within thirty days after such loss or damage occurs and such action shall be brought within twelve months after such destruction or injury occurs."

Several special pleas were put in to the declaration, intended to exempt the city from liability, as that the city exercised all its power to prevent the loss; that the United States and the state of Illinois, as well as the city of Chicago, were all interested and engaged in protecting the property so lost; and that the city had not property or funds except such as could be raised by taxation to pay the loss. A demurrer to these pleas was sustained, and the pleas overruled, the court holding the city liable for the damage charged, done by the mob, upon the adjudged cases,—citing Underhill v. City of Manchester, 45 N. H. 214; Darlington v. City of New York, 31 N. Y. 164, 88 Am. Dec. 248; Allegheny Co. v. Gibson, 90 Pa. 397, 35 Am. Rep. 670; Cooley, Tax'n, 480; Louisiana v. City of New Orleans, 109 U. S. 285, 3 Sup. Ct. 211, 27 L. Ed. 936. The law as determined by the court below on the question of liability in a proper case seems to be well settled by these and other decisions. The case was tried before a jury, and a verdict rendered in favor of the plaintiff for the sum of $2,792.58, upon which judgment was rendered which the writ of error is brought to reverse.

The case seems to have been carefully tried, and at the close of the trial the jury were fully and fairly instructed upon all the issues. We have been at the trouble of reading the evidence, as many of the assignments of error seemed to be based upon objections to the sufficiency or competency of the testimony. But we find no error in the record. The evidence of the plaintiff seems to be full and

abundant, even conclusive, upon all the material issues, and the verdict of the jury was certainly moderate in view of evidence of damage. There are 69 assignments of error, as though it were intended to make up in number what is apparently lacking in force. But, if counsel will incumber the record with such an apparently needless number of exceptions and assignments of error, it can hardly be expected that the court should consider them all, in detail or otherwise, except in a collective way. We shall notice such as were mainly argued and relied upon on the hearing.

It is assigned first as error that the declaration does not state a cause of action, and that for that reason the verdict and judgment are against the law. We think this question was correctly decided on the demurrer to the pleas.

It is objected that it was not shown on the trial that the plaintiff's property was destroyed in consequence of a mob. It is hard to see what could be asked for in the case on this point more than was produced in evidence. There were dozens of eyewitnesses testifying to the riot and the overturning and destruction of cars and other property by fire and otherwise in consequence thereof. The mob was such for several days that the mayor called on the governor by telegram for troops to subdue it by force. Troops were called out, both state and national, to put down the riot and stay the destruction of property, and but for these troops it is difficult to see that the ravages of the mob could have been stayed. A few examples of testimony from many witnesses who were present will suffice to show the slight ground there is for this assignment.

Chas. D. Law, connected with the company since 1873 and superintendent of the Western division of the Ft. Wayne road, between Crestline and Chicago, testified that he was in Chicago during the forepart of July, 1894. "The 6th of July, in the morning about 9 o'clock," he says, "I noticed crowds beginning to gather inside of the yard at Fifty-First street. I then telegraphed to our headquarters in town asking for some protection, either police or military. I received an answer that a company of regulars, the Fifteenth or Sixteenth Regulars, which were then on duty at the Rock Island crossing at Fifty-First street, would be ordered by General Miles, or the commanding officer, at least, to report to me at Fifty-First street. I went over to the Rock Island tracks as quickly as I could, and found the captain in command, showed him this message, and found that he had not yet received his instructions; but, without waiting for them, he called his men together and we marched over from the Rock Island tracks to our tracks. We marched down Forty-Seventh street, and then down the track to Fifty-First street. When we reached Fifty-First street there were, I should say, at least 300 people congregated just inside of the fence on our ground, at least on the street crossing adjacent to it. Capt. Conrad, who was in command of the company, stepped out and informed his men first to cross the street, and he stepped in front and ordered the crowd to disperse. * * * He made another attempt to disperse them, but they laughed and hooted and made quite a good deal of noise. He then directed the lieutenant in charge to charge the crowd, which he did, and drove

them back outside the fence which marks the limits of our property on the east. Then the troops came back to their original position, which was about half way between the main track and the easterly line of our property, and still preserved that line, full company front, across Fifty-First street. By the time they had returned to their first position the crowd had surged in upon the company's property, and the captain again spoke to them, going out in front of his company, and talked to them, told them to go away, with the same result as before, and also the same result as to the charge. They charged the crowd a second time with bayonets. After that charge they stayed outside. Then I called the captain's attention to the necessity of placing guards at different points along the yards to keep unauthorized persons away, and before we had an opportunity to get any of these guards stationed, a fire broke out among the cars immediately south of Fifty-First street and east of our tracks, east of our main tracks,—what we called the 'east yard.' Side tracks are laid east of the main tracks. I ran down to Fifty-Fifth street to get some engines there to pull the cars away from there,—cars that were south of the burning cars,—pull them away to set them in other parts of the yard so the fire would not communicate to those cars. About the time I got to the south end of the yard the city fire department arrived and was playing on this fire. My recollection is that there were 25 or 30 cars damaged or burned in that fire. That was the 6th of July in the afternoon. I saw a crowd of men surrounding several cars immediately north of Fifty-First street on the side track and throwing them over,—throwing the boxes of the cars off of the tracks. This was on our right of way. I cannot say how many cars. I can recall I saw three thrown over. I cannot say that I saw more than three. I should say there were 25 or 30 persons in the crowd. Then on the west side of our main tracks, what we call our 'west end,' another crowd of about 20 people pushed a car that was standing on one of these yard tracks out over the lead track,— that is the track which connects the switch track, so called, in the yard, with the main tracks,—out over the lead until it got out and fouled the main track, to block that track. They pushed it from the side track onto the main track. That car stayed there. While I stayed there, there were at least three cars that I saw overturned. After that I saw a number of cars that had been overthrown, but I did not see the operation performed. As to these overturned cars, I ordered the wrecking car out with a crew to set them up along the tracks, to pick these cars up, take them off the main tracks, and replace them upon their trucks. That was done during the afternoon. The same operation had to be performed again that night on cars that were overturned. That is all I saw on that day, excepting I saw fires started from one or two little shanties that we had, which were burned. I saw fires as they started from one or two little shanties, the yardmaster's office at Forty-Seventh street, and a little building we had at Fifty-First street, which was used by the crossing watchman and also by passengers who came to wait for our accommodation trains. I saw the fires start, and saw them burning from a distance; but I was not there. I did not see anybody around

them, and did not see anybody set fire to them. I saw the fires burning. * * * The cars which had been upset, which I did not see upset, as I have stated, were thrown over on their side across the main track, and were splintered and broken; that is, the boxes, the body of the car, roofs damaged, and cars generally racked, and besides the sidings of the cars broken. I do not say how many cars I saw that had been turned over. There were quite a number, but I cannot give the exact number. I did not keep any record of it. I should think there were 12 or 15, perhaps. They were scattered all along from Fifty-Fifth street north. They were lying across our tracks. These were not our cars. They were on the stockyards track, but they blocked our track so we did not get our passenger trains out on the night of the 6th at all,—trains which should have left at 5 o'clock. I say a part of those which were upset on the stockyards track, those were not our cars. Those were in charge of the stockyards company or some other road using their tracks. I should say 12 or 15 of our own cars on our own tracks were upset."

L. G. Haas testifies that he saw a crowd of persons engaged in overturning cars in the vicinity of Fifty-Fifth street on the 5th of July, and saw a number of cars that had been overturned.

E. M. Wineman testifies that on the 6th of July at Fifty-First street he saw a turbulent crowd of persons close up to the burning cars, and heard a number of persons in the crowd say they would not allow any cars to run.

W. J. Prindle testifies that disturbances on the plaintiff's road in Chicago began on the 28th of June and continued until the 9th of July; that at Forty-Seventh street July 6th employés were driven away from their work, cars overturned and burned, main tracks obstructed by piling timbers thereon and pushing cars from sidings; that a crowd of 300 people blocked the tracks, stoned him and other employés of the plaintiff, and threatened their lives; that this crowd was dispersed by soldiers. Thirty cars were burned in the Forty-Seventh street yard, switch targets destroyed, etc.

Richard Nelson testifies that on the 5th of July at Thirty-Ninth street he saw a car lying overturned, and a crowd of 500 to 1,000 people a little riotous; that he walked south along the tracks to Forty-Seventh street, where he saw a crowd of 200 people standing along the sides of the track, when suddenly 15 or 20 men rushed up to a car and turned it over on the main track, and then the crowd hurrahed; that next day about half past 9 o'clock he saw 15 or more men shove a car out from the siding onto the main track in the presence of several hundred people, who were yelling and holloing, laughing, and jeering; that shortly after, about half past 10, a fire broke out in the yard at Fifty-First street, and later when the firemen were there they were yelled at and hooted by a crowd of 40 or 50 persons; that a lieutenant of infantry with 15 men came up and charged bayonets on them. Twenty-two cars were burned at that fire.

The testimony of W. S. Morgan is to the effect that he saw a crowd tip over a car bodily at Fifty-First street July 5th, in the presence

of a crowd of 200 or 300, and then proposed to go to the roundhouse and blow up the ———— scabs.

The testimony of F. P. Smith is to the effect that on July 4th cars were upset and burned between Forty-Ninth and Fiftieth streets in the presence of a crowd of 300 or 400 people.

W. Kramer testifies that he saw a crowd of some 200 people at Forty-Seventh street July 5th, 20 or 30 of whom pushed some cars onto the track in front of his wrecking train and told him to pick up his tools and go home.

T. B. Hunt testifies that on July 6th he saw a large crowd at Fortieth street, where a milk train was stopped. The crowd holloed when raided by policemen, and shots were fired. Fire at Fifty-First street breaking out about that time.

Mr. Clapp saw a crowd surge back and forth along the track and upset cars near Fifty-First street; that the crowd said they were going to smash and upset the cars, and stop the road from running, and lay out the railroad men.

Thomas Griffin testifies that from the 1st to the 8th of July 300 cars were stored between Forty-Seventh and Fifty-Fifth streets; that crowds began gathering on the 29th of June, and the 3d of July cars were upset at Fortieth street; that July 4th a great crowd of people attacked the cars at Forty-Seventh street, and set fire to them, and tried to stop the firemen from putting the fire out. Pushed cars from the side tracks onto the main track; that the air was ringing with "Scabs!" that a great crowd at Fortieth street stoned a milk train, bruising it pretty bad and injuring the engineer; stoned and shot at the witness.

L. H. Pender testifies he saw persons gather along the tracks July 3d to 7th. Saw cars lying on the track, Forty-Seventh to Fifty-First street, and helped to pick them up with the wrecking train; was struck with a stone at Forty-Seventh street, and shot at near Forty-Fifth street, in the presence of about 500 people.

A. Cheffer testifies to seeing a crowd of from 100 to 300 persons at Fifty-First street in the afternoon of July 5th tipping over cars; that the same crowd raided a car of merchandise; that one of the crowd named "Shorty" called on others to go to the yards and kill some one.

Conductor E. Longhenry testifies as to how on the 5th of July he was assaulted and his train taken away from him at Forty-First street in the presence of a crowd of some 5,000 persons.

Engineer F. Stucker, of the same train, testifies as to how the mob stopped the train, got on his engine, and told him to go home, which he did.

Charles Fair, fireman on the same train, testifies as to how the crowd swarmed on and along the track, causing the train to stop, mounted the engine, and, seizing him, threw him bodily into the crowd, who caught him and carried him half a block away and told him to "git"; that the crowd overturned two cars on the track behind the train and put a rail through the spokes of the two driving wheels, so that the engine could not move; that from the 1st to the 5th of July they were frequently stoned.

Many other witnesses testified in a similar manner. There seemed to be no lack of evidence as to the fact of the property of the company being destroyed in consequence of the mob. It seems quite clear that the verdict of a jury upon such evidence as this must be conclusive that the destruction of the plaintiff's property was in consequence of the riot. The Chicago riots of July, 1894, are a matter of public history, and if the courts cannot take judicial notice of their existence it is only because the court is not presumed to know what every one else knows. The vital question in the case was, not whether there was a riot, but whether and to what extent the property of the Pennsylvania Company, which had many miles of track running through the south side of the city, was injured in consequence of it.

Exception was also taken to the introduction of the proclamation of the mayor calling for troops to suppress the riot, but such evidence was clearly admissible as a public act which had become a part of the history of those perilous and disturbing days, when danger to life and property throughout the city was imminent. The argument of counsel on this question that Hopkins had no authority to send the telegrams as mayor of the city, and that the sending of the state militia by the governor could not be lawfully in response thereto, but was only upon his own volition and responsibility, seems quite unfounded and irrelevant. What else could the mayor do, having the law to execute and the lives of millions under his charge, but call for military aid? It was a part of his official duty, and in the faithful discharge of it he should be upheld by all good citizens of the commonwealth.

It is also objected that the notice of claim served on the city was insufficient. It is only necessary to state what that notice was to show the triviality of such exception. This is the notice of claim for damages served upon the city, which is clearly sufficient, in connection with the attached schedule of property alleged to be destroyed, which is quite specific and lengthy:

"State of Illinois, County of Cook—ss.

"To the City of Chicago: You are hereby notified that, in consequence of a mob or riot, composed of twelve or more persons, the property of Pennsylvania Company, operating the Pittsburg, Ft. Wayne & Chicago Ry., was, within the city of Chicago, Cook county, Ill., while not in transit, destroyed or injured; that the dates and places of destruction or injury, and the damage to and description of said property, are stated in the schedule hereto attached, as accurately as can now be ascertained; that such destruction or injury was not occasioned, or in any way aided, sanctioned, or permitted, by the carelessness, neglect, or wrongful act of said company; that said company used all reasonable diligence to prevent such injury, damage, and destruction; and that claim against you for three-fourths of such injury, damages, and values is made, and payment thereof demanded, pursuant to the provisions of an act of the legislature of the state of Illinois, entitled 'An act to indemnify the owners of property for damages occasioned by mobs and riots,' approved June 15th, A. D. 1887. ' Pennsylvania Company,
"Operating the Pittsburg, Ft. Wayne & Chicago Railway,
"By J. T. Brooks, 2nd Vice Prest."

One of the principal exceptions relied upon is that the title of the Pennsylvania Company to the property was not sufficient to war-

rant a recovery. The plaintiff's interest and title to the property was that of lessee and bailee,—to some as lessee of the Pittsburg, Ft. Wayne & Chicago Railway Company's track and equipment, and bailee of the certain cars marked with the initials of several other railroads, which were the general owners. As would naturally be expected, some of the cars destroyed belonged to other roads, and were in the possession and use of the plaintiff as bailee and common carrier for the time being. This gave the company a special interest in them, and it was responsible for the safe-keeping and return of the cars. The company was the owner in a sense, though not having the general title, and it is clear that the recovery·cannot be limited to the property to which the company had the full title. Possession with a special interest as bailee is enough. It was not necessary that all persons having an interest in the property should be made plaintiffs. It could not have been contemplated that under the statute all persons having any interest in the property should be required to come to Chicago and bring separate actions, or join in one action for the recovery of damages. The statute did not change the general rule at common law that a common carrier may sue in his own name and recover for the value of the property which has been injured or destroyed by another while in his possession, and that bailees of property may sue in their own name and recover for wrongful injury to property in their possession. Schouler, Bailm. 531; Ang. Carr. § 348; Story, Bailm. § 93; Hil. Torts, p. 491, c. 18. Schouler lays down the rule thus: ·

"In conformity with the general doctrines of mutual benefit bailments, every common carrier is invested with a special property in the goods and chattels which a customer confides to him, so that he may maintain an action against any and all persons who disturb his possession thereof and injuriously interfere with the performance of his lawful duties. It is the general rule, applicable alike to real and personal property, that possession is both sufficient and necessary to maintain an action for a tort or wrong; more especially that 'bare possession gives a right against a wrongdoer for the invasion whereof an action of trespass will lie.' "

In The Beaconsfield, 158 U. S. 307, 15 Sup. Ct. 860, 39 L. Ed. 993, it was held that a carrier is so far the representative of the own_r that he may sue in his own name, either at common law or in admiralty, for a trespass upon or injury to the property carried. And it was held in Hardman v. Brett (C. C.) 37 Fed. 803, 2 L. R. A. 173, that:

"Every bailee has a temporary qualified property in the thing of which possession is delivered to him by the bailor, which entitles him to maintain an action against any stranger who injures it; and the reason is because he is answerable over to the bailor and ought not to be responsible for the loss without being able to resort to the person who was the original cause of the injury."

See, also, Railroad Co. v. McIntire, 39 Ill. 298; Railroad Co. v. Schultz, 55 Ill. 421; Benjamin v. Stremple, 13 Ill. 466; Hutton v. Arnett, 51 Ill. 198.

Then it is objected that some of these cars destroyed were in transit and for which no recovery could be had under the statute. But the evidence shows that the cars were not in transit, but were stored in plaintiff's yards until wanted for actual use. The finding of the

jury upon this, as upon the other issues of fact, is final and cannot be questioned.

Various exceptions were made to the introduction of evidence and the refusal of the court to strike from the record, but we think no one of these exceptions maintainable, and if we do not notice them all in detail it is not because they have not been considered and passed upon. The trial lasted many days and many witnesses were sworn and examined. The case was well and carefully tried. An unusual number of exceptions were taken by defendant's counsel, but we find the record unusually free from error, and the plaintiff in error has little to complain of. "All hoods make not monks," and it is not every exception, or any number of exceptions poorly grounded, that can avail to reverse a judgment so well bottomed upon testimony and the verdict of a jury as is this.

The judgment of the court below is affirmed.