## WELLS FARGO & CO. v. MAYOR, ETC., OF JERSEY CITY.

(Circuit Court of Appeals, Third Circuit.    January 30, 1915.)

No. 1840.

MUNICIPAL CORPORATIONS ☞740—INJURIES TO PROPERTY—CITY'S LIABILITY —STATUTES—CONSTRUCTION—"PROPERTY."

New Jersey Act 1874 (Rev. St. p. 714; P. L. 1864, p. 237; Revision 1877, p. 978; 4 N. J. Comp. St. 1910, p. 4380; 3 Gen. St. 1895, p. 2782), is entitled "An act to prevent routs, riots, and tumultuous assemblies," and section 5 declares that, whenever any building or other real or personal "property" shall be destroyed or injured in consequence of any mob or riot, the city in which it shall occur shall be liable to an action by or on behalf of the owner. *Held*, that while the word "property," strictly speaking, in a thing, is different from the thing itself, and includes the right to use, enjoy, and control, which is neither visible nor tangible, and in that sense the word is often used as applied to the right to carry on business, the word as used in such act was not intended to include intangible property, so that a city under such act was only liable for damage to tangible, as distinguished from intangible, property.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1558, 1559; Dec. Dig. ☞740.

For other definitions, see Words and Phrases, First and Second Series, Property.]

In Error to the District Court of the United States for the District of New Jersey; John Rellstab, Judge.

Action by Wells Fargo & Company against the Mayor and Aldermen of Jersey City. Judgment for plaintiff for less than the relief demanded (207 Fed. 871), and it brings error. Affirmed.

Gilbert Collins, of Jersey City, N. J., and Charles W. Stockton, of New York City, for plaintiff in error.

John Milton, of Jersey City, N. J., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

J. B. McPHERSON, Circuit Judge. During the three weeks from October 25 to November 14, 1910, the express business of Wells Fargo & Co. and their tangible property in Jersey City suffered injury at the hands of a mob. The injury resulted from riots accompanying a strike that was directed at first against another express company. In January, 1911, the company sued the municipality to recover damages, claiming under a revised statute of New Jersey, approved in 1874 (Rev. St. p. 714; P. L. of 1864, p. 237; Revision of 1877, p. 978; 4 Comp. St. of N. J. 4380; 3 Gen. Stat. 2782). The verdict determines that the company fulfilled all the obligations laid upon it by the act, fixing the damage done to the company's tangible property at $300, and the dam-

age done to its business, its intangible property, at $43,000. The verdict was special, separating these sums and submitting to the court the question whether the city was legally liable for the larger amount. After further consideration, the trial judge decided this question in favor of the city, and entered judgment for $300 only. His opinion is reported in 207 Fed. at page 871, and is a careful and painstaking discussion of the subject. We agree with his conclusion, although we do not find it necessary to assent to the course of his argument throughout. The subject is important, and the precise question has apparently not been considered, or at all events has not been discussed, in any reported case.

We do not overlook Palmer v. Concord, 48 N. H. 211, 97 Am. Dec. 605—a suit brought by the owner of a journal whose printing office had been wrecked by a mob—in which the court appears to hold:

"That if the plaintiff was entitled to recover anything, he should recover for the damage resulting from the interruption or destruction of the plaintiff's business, and for the injury to the good will of the paper, so far as such interruption and injury were the direct and natural results of the attack of the mob."

But, as no reasons are given for this ruling, and as the question arose under a peculiar procedure whose judicial effect we do not clearly understand, we feel justified in laying that case aside. Moreover, even if we allow it full value as an authority, it merely determines the scope of the New Hampshire statute, and therefore is not decisive on the meaning of different language in the statute now before the court.

And at this point we may add that the only question raised has to do with the city's liability for the item of $43,000, so that the general subject of municipal liability for injury done by a mob need not be considered. It is fully discussed in the cases cited in the notes to Prather v. Lexington, 56 Am. Dec. 589, Darlington v. New York, 88 Am. Dec. 266, and Gianfortone v. New Orleans, 24 L. R. A. 592. Later collections of authorities will be found in the notes to 28 Cyc. 1295f et seq.; and to 4 Dill. Mun. Corp. (5th Ed.) § 1636. The most recent decision to which our attention has been called is Chicago v. Sturges, 222 U. S. 313, 32 Sup. Ct. 92, 56 L. Ed. 215, Ann. Cas. 1913B, 1349. From all these citations it is certain that, while the common law may recognize the principle that a municipality should preserve social order at some risk of being punished for failure, the particular form of liability now before the court rests wholly upon statute. This being so, the extent of the liability must depend upon the meaning of the particular statute, and this brings us at once to the region and the rules of statutory construction.

The New Jersey Act of 1874 is entitled "An act to prevent routs, riots, and tumultuous assemblies." Apparently, it has never been construed by the Court of Errors and Appeals, and only once by the Supreme Court of the state. Clark Thread Co. v. Hudson County, 54 N. J. Law, 265, 23 Atl. 820. That case merely decides that the object of the act was to prevent mobs and riots, and that the title is broad enough to cover the provision for compensation contained in the fifth section. But we cannot suppose that the act had no other object than to prevent

riots, although this was no doubt its principal object. But subsidiary thereto and included therein, another object is certainly to be found, namely, the compensation of those injured thereby; so that we need not hesitate to say that in part at least the statute was intended to provide for such compensation. Section 5 enacts as follows:

"5. Compensation for Damage by Riot, etc.; Liability of City or County.—That whenever any buildings or other real or personal property shall be destroyed or injured, in consequence of any mob or riot, the city in which the same shall occur, or if not in a city, then the county in which such property was situated, shall be liable to an action, by or in behalf of the party whose property was thus destroyed or injured, for the damages sustained by reason thereof."

Now the question of immediate interest is: How far did the Legislature intend to go by this section? What "property" was in the legislative mind? In our opinion there is no antecedent presumption, one way or the other. The whole subject being within the legislative power, compensation might be total or partial, precisely as the lawmaking body might choose, and we see no need to search for the meaning of the act with a leaning toward a strict, or for that matter with a leaning toward a liberal, construction. Here, as in other cases of construing a statute, the vital question is: What does the language mean? And we must find the answer by such helps as may be at hand. One thing is apparent at first glance: The thought is not precise and the expression is awkward. And this is probably a sufficient warning that we will not find the content of the word "property" to be so all-inclusive and somewhat metaphysical as the plaintiff's brief contends. We agree with much of the argument. Strictly, and as a matter of abstract reasoning, "property" in a thing is different from the thing itself. It is a right to use, enjoy, and control, and therefore is neither visible nor tangible. In this sense, which is often properly applied, the right to carry on a business is property. But we are not able to agree that such a conception was present in the mind of the draftsman or of the New Jersey Legislature. If it had been, the word "property" alone would have been employed, for nothing more would have been needed. It seems plain, however, that a more limited conception of "property" was embodied in the statute, for the phrase, "buildings or other real or personal property," while it is awkward and incorrect, does convey the idea that the "property" thought of consists of things and not of intangible rights. And we find the same idea again in section 5 (and also in section 7, which we need not quote), where the property is twice referred to as existing physically in space—as "situated," or "situate," in a described municipality.

It may be doubted whether the rule of ejusdem generis can fairly be applied to the phrase just quoted; but we do think that the whole section should be construed in the light of another and a more valuable rule—that the language of a statute is to bear its usual and ordinary meaning unless sufficient indications exist to show that the language has been used in a special sense. It seems to us that section 5 is drawn in the loose and easy phraseology of common speech. The construction is anything but precise: One at least of the clauses is capable of more meanings than one; the grammar leaves something to be desired; but,

after every criticism has been made, the general sense emerges with sufficient clearness. The section contemplates that the injury may be done either in a county or in a smaller municipality, a city; and this means necessarily that there may be a mob or riot in either, where of course the duty of prevention or protection would fall upon the appropriate officers of the peace. And the section also has in mind such property only as can have a local habitation within a city or a county, and is therefore capable of receiving injury at some definite point in space. As we all know, language is an elusive instrument; it is often susceptible of several meanings, especially the meaning that we bring to it and desire it to bear; and therefore the task· is sometimes perplexing to determine with confidence in what sense the words were really used. In such a situation, courts have been obliged to do their best with many difficulties, and in the course of prolonged experience they have evolved certain rules that work satisfactorily on the whole. The rule we have been considering is applied perhaps more often than any other, and we think it solves the problem now in hand. To us it seems plain that we cannot reach the conclusion desired by the plaintiff without giving an unusual meaning to the phrase in question—a meaning unknown to common speech—and this, in spite of the fact that no indication is to be found in the statute to suggest that such a meaning was intended. It has some weight, also, that no legislature has expressly given such compensation as is now asked for; and that no court (with the doubtful exception of Palmer v. Concord) has construed, or has apparently been asked to construe, the general language of any statute so as to embrace such compensation.

Without prolonging the discussion, we repeat our approval of the judgment below and direct its affirmance.