WILLIAM FEINSTEIN, Plaintiff, *v.* CITY OF NEW YORK, Defendant.

Municipal Court of New York, Borough of Manhattan, Third District, October 30, 1935.

*Charles Garfinkel*, for the plaintiff.

*Paul Windels, Corporation Counsel* [*Aaron Arnold, Assistant Corporation Counsel*, of counsel], for the defendant.

SHALLECK, J. On March 19, 1935, at about eleven P. M., a group of about thirty people gathered in the vicinity of Lenox avenue and One Hundred and Thirty-second street, created disturbances, hurled various missiles, broke store windows, set fire to some stores, pillaged others, and in general damaged property of various merchants in the locality, and continued to do so despite the efforts of the police, who, in order to quell the disturbance and prevent the destruction of property, discharged their revolvers in an attempt to disperse the crowd, all of which was without avail. At times the police succeeded in driving the participants from one side of the street, but they would then rush to the other side and back again, all the while continuing their destructive acts.

Plaintiff conducted a retail liquor store at 452 Lenox avenue. Its show windows were protected by iron gates. The manager of the store testified that he heard the shots fired by the police and saw the disturbances from his store. He became frightened, locked the doors, closed the gates and departed at about midnight. Up to that time plaintiff's property had not been molested.

It was also testified that at about one-fifteen A. M. (March 20, 1935) a group of between thirty and forty people smashed plaintiff's windows, broke down the gates, pilfered bottles of whisky and demolished the store front, all of which the police were unable to control.

Plaintiff seeks to recover from the city of New York for damages thus sustained under section 71 of the General Municipal Law.

Upon consent of counsel, framed issues of fact were submitted to the jury, all of which were answered favorably to the plaintiff, as follows:

1. Q. Was there a riot or mob at or near 452 Lenox avenue on March 19, 1935, at about eleven P. M.? A. Yes.

2. Q. Did the riot continue past twelve-five A. M. on March 20, 1935, near the same premises? A. Yes.

3. Q. Was the plaintiff's property destroyed or injured by a mob or riot on March 20, 1935? A. Yes.

4. Q. Did the plaintiff's consent or negligence contribute to the destruction or injury to his property? A. No.

5. Q. Did the plaintiff use all reasonable diligence to prevent such damage? A. Yes.

6. Q. What damage did the plaintiff suffer? A. $450.

The defendant asserted no defense and moves to set aside the verdict and to dismiss the complaint.

Section 71 of the General Municipal Law reads as follows:

" § 71. Liability for damages by mobs and riots. A city or county shall be liable to a person whose property is destroyed or injured therein by a mob or riot, for the damages sustained thereby, if the

consent or negligence of such person did not contribute to such destruction or injury, and such person shall have used all reasonable diligence to prevent such damage, shall have notified the mayor of the city, or sheriff of the county, of a threat or attempt to destroy or injure his property by a mob or riot, immediately upon acquiring such knowledge, and shall bring an action therefor within three months after such damages were sustained. A mayor or sheriff receiving notification of a threat or attempt to destroy or injure property by a mob or riot shall take all lawful means to protect such property; and if he shall neglect or refuse, the person whose property shall be destroyed or injured, may elect to bring his action for damages against such officer instead of the city or county." (Laws of 1909, chap. 29.)

The original law enacted in this State on this point may be found in chapter 428 of the Laws of 1855. (See, also, Birdseye's Edition of the Revised Statutes, 1890, vol. 2, " Mobs and Riots," and the General Penal Code provisions thereto annexed.) This law was also re-enacted as chapter 685 of the Laws of 1892 as section 21 thereof. These laws were subsequently repealed in 1909 and re-enacted as section 71, *supra*.)

The statute is not one of recent vintage. It finds its genesis in the common law of England, the first written acknowledgment thereof being embodied in 1 Stat. 13 Edw. I, p. 2, chap. 3; later in 27 Eliz. chap. 13. See Coke's Institutes of the Laws of England [1st Am. ed.], " Crimes," chap. 12. These laws existed in various forms until in 1714, when statute 1 Geo. I, stat. 2, chap. 5, was enacted commonly known as " The Riot Act." Subsequently, and in 1827, the act was amended and consolidated in 7 and 8 Geo. IV, chap. 31; and finally, the statute which now exists in England was enacted in 1886, 49 and 50 Vict. chap. 38, commonly known as " The Riot (Damage) Act."

The defendant contends that the plaintiff failed to prove that a riot occurred. In " The Laws of England " (Vol. 9, p. 471) the Earl of Halsbury asserts his definition of a riot under the earlier statutes: " A riot is a tumultuous disturbance of the peace by three or more persons, who assemble together, without lawful authority, with an intent mutually to assist one another against any who shall oppose them in the execution of some enterprise of a private nature, and who afterwards actually begin or execute the same in a violent and turbulent manner to the terror of the people. It is immaterial whether the enterprise intended was of itself lawful or unlawful, and it is sufficient if only one person was put in fear."

At the trial I charged substantially the above. I also charged the definition contained in the Penal Law as follows:

" § 2090. Riot defined. Whenever three or more persons, having assembled for any purpose, disturb the public peace, by using force or violence to any other person, or to property, or threaten or attempt to commit such disturbance, or to do an unlawful act by the use of force or violence, accompanied with the power of immediate execution of such threat or attempt, they are guilty of riot."

The defendant excepted, claiming that this definition of a riot comprises a criminal riot as distinguished from a riot giving rise to a suit civilly. It is significant to note that this was in effect the definition of a riot at common law. In *Regina* v. *Phillips* (2 Moody Cr. Cas. 252) the court had before it the interpretation of a riot under 7 and 8 Geo. IV, *supra*, and the court there declared that that statute " not having given any definition of what shall be a riot within the meaning of that enactment, the common-law definition of a riot must be resorted to, and in such a case, if any one of her Majesty's subjects be terrified, this is a sufficient terror and alarm to substantiate that part of the charge of riot." In *Adamson* v. *City of New York* (188 N. Y. 255) the court said (at p. 258): " In interpreting this statute which defines an offense well known at common law, we are entitled to seek aid from common-law definitions of such offense."

In *Field* v. *Receivers of Metropolitan Police* (L. R. 1907, 2 K. B. 853), a case which arose under the English statute of 1886, the learned court asserts that a riot consists of the following elements: " (1) number of persons, three at least; (2) common purpose; (3) execution or inception of the common purpose; (4) an intent to help one another by force if necessary against any person who may oppose them in the execution of their common purpose; (5) force or violence not merely used in demolishing but displayed in such a manner as to alarm at least one person of reasonable firmness and courage." This case was approved and followed in *Ford* v. *Receiver for Metropolitan Police District* (L. R. 1921, 2 K. B. 344). Neither in these reports nor in Halsbury's Laws of England are these the only definitions to be given. 2 Hawkins' Pleas of the Crown ([7th ed., London], chap. 65, § 1) defines a riot as in Halsbury's Laws of England, *supra*.

The statute (General Mun. Law, § 71) is both compensatory and penal. The general compensatory principle " follows from the ancient theory of the responsibility of each recognized area for the preservation of the peace within its borders that, in the event of damage to property ensuing from the riotous assemblage of persons within the area, such damage shall be made good at the expense of the inhabitants of the area." (22 Halsbury's Laws of England, 507.) It is penal " so far as it throws the burden of that compensa-

tion upon the municipality within whose borders the destruction took place." (*County of Allegheny* v. *Gibson's Son & Co.*, 90 Penn. St. 397, 418.) "The statute was intended to punish the inhabitants for permitting riots and unlawful assemblages and to incite them to prevent and suppress the same by making it a matter of interest to taxpayers to give their moral support to the enforcement of law and order." (*Marshall* v. *City of Buffalo*, 50 App. Div. 149.)

The harmony of courts, commentators and writers is apparent. A thorough research in the evolution of this statute from its very inception discloses that at all times it was necessarily linked with the various penal provisions existing at the same time. Recognition of the similarity between the definition of a riot or mob in a civil suit with that in a criminal proceeding can be found in our New York cases as well. (See *Adamson* v. *City of New York*, 188 N. Y. 255; *Salisbury* v. *County of Washington*, 30 App. Div. 187; *Marshall* v. *City of Buffalo*, *supra*.)

The conclusion is inevitable, as the evidence before me clearly demonstrates, that a riot occurred on the night in question and that each of the elements constituting a riot was present.

The defendant claims that plaintiff's failure to notify the mayor of the city or the sheriff of the county immediately upon his acquiring knowledge that a threat or attempt to destroy or injure his property was made by a mob or riot, as required by the statute, precludes a judgment in plaintiff's favor. From the testimony adduced, it was impossible for the plaintiff to have notified the mayor or sheriff. Not only that, but the city had already known of the existence of the riot and had even taken measures to quell it.

The notice provided for in the statute is "for the purpose of protection to the property, to enable the constituted civil or military authorities, or both, to meet or overcome riotous, illegal force by organized legal force, and thus afford protection to persons and property. * * * What good, for any purpose of protection, would or could have resulted from the plaintiff giving notice to the mayor or sheriff that this mob had threatened his property? They both knew already [through their agents] that all the property in that part of the city, as well as human life, was threatened by this mob, and were exerting their utmost power to subdue it." (*Newberry* v. *Mayor*, 1 Sweeny, 369.) "It is not intended to restrict the action against a city or county to such as shall give notice to the sheriff, if such notice be useless for the purpose of protection. The statute must receive a reasonable and liberal construction." (*Schiellein* v. *Supervisors of Kings County*, 43 Barb. 490.) "For it could not have been the intention of the legislature to make the remedy of the party whose property should be injured or destroyed,

dependent upon an act which it would be otherwise utterly impossible for him to perform. To require the notice in all cases, would not only be idle but it would also be absurd. Under such a construction the redress which the statute provides would be only available in those cases where the mob, or riotous assembly, proceeded with so much deliberation and publicity as to allow their purposes to become known to the party whose property was intended to be injured or destroyed." (*Moody* v. *Board of Supervisors of Niagara County*, 46 Barb. 659.) " It would be equally unnecessary to give notice to the sheriff or other officer where he already had knowledge of the facts, or such notice would be unavailing for the purpose of protection." (*County of Allegheny* v. *Gibson's Son & Co.*, *supra*, at p. 414.)

In the light of such unequivocal statements which are wholly consistent with recognized logical behavior on the part of human beings, notice to the sheriff or mayor as required by the statute was unnecessary, in view of the attendant circumstances, and I accordingly withdrew such consideration from the jury.

The contention made by the defendant that the plaintiff did not exercise reasonable care for the protection of his property in that he failed to remove from his windows the stock there on display, was disposed of when the jury answered the question of fact submitted to it, " Did the plaintiff use all reasonable diligence to prevent such damage?" in the affirmative.

The defendant, seeking to take advantage of a typographical error made by the plaintiff in his notice of claim, asks a dismissal of the complaint on the ground that the notice of claim states that the damage occurred on " April 20th " instead of " March 20th." The defendant lost no rights by this error. To prove the unreasonableness of the defendant's demand, I need only refer to the fact that the notice of claim was acknowledged on April eighteenth and served on the comptroller on April nineteenth, stating that the damage occurred on April twentieth. Surely, plaintiff was not giving notice on April nineteenth that he was anticipating a loss on April twentieth. However, the defendant was not without knowledge of the correct date. On May sixteenth the plaintiff was examined by the corporation counsel concerning his loss. At that examination he testified that the riot and consequent damage occurred on March nineteenth and twentieth. Furthermore, plaintiff's complaint alleges March twentieth as the date. Unquestionably the defendant had notice that the riot occurred at that time. Plaintiff's testimony satisfactorily explained this error.

I may state, in short, that the statute under consideration is to be liberally construed and that technicalities are to be discounted

to the end that the merits of the plaintiff's case might be judicially weighed. The plaintiff was " merely obliged to show, by a preponderance of evidence, facts and circumstances from which the jury may fairly infer that the property was destroyed by a mob or riot within the spirit, true intent and meaning of the statute. * * * We should not be unduly governed or controlled by the application of technical rules or definitions, as in a criminal prosecution, but rather by a reasonable, fair, liberal and at the same time prudent interpretation of this remedial statute, imposing the obligation on the city on the one hand, and creating the right to compensation by the property owner on the other." (*Marshall* v. *City of Buffalo, supra.*)

Section 71 of the General Municipal Law may result in considerable loss to the city of New York. I am informed by the corporation counsel that many similar cases are now pending in our courts. In a city of seven millions of people with such a cosmopolitan population, further disturbances may frequently occur. The statute may have by this time outlived its usefulness when applied to cities of such size. That does not come within the province of this court to determine. The propriety of such legislation and the responsibility therefor rests with the people of this State as reflected by the actions of the Legislature. It may well be that the Legislature will realize the serious consequences of concerted efforts on the part of some persons to use the statute as a means of enrichment, to the consequent loss to the community. If so, it will enact appropriate amendment to the existing law. This court must interpret it in its present form.

I hold, therefore, that the findings of the jury are conclusive upon me, and accordingly the defendant's motions are denied. Ten days' stay of execution. Submit judgment on two days' notice.