103 N.J. Super. 559 (1968)
248 A.2d 258
A & B AUTO STORES OF JONES STREET, INC., A CORPORATION, ET AL., PLAINTIFFS,
v.
CITY OF NEWARK, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided November 29, 1968.
*563 Messrs. Herman D. Michels and Samuel A. Gennet for plaintiffs (Messrs. Herman D. Michels, Marvin A. Sachs, Lester Sandles, Stanley M. Teich and William J. McGee, attorneys for committee representing plaintiffs in consolidated actions).
Mr. Norman N. Schiff for defendant City of Newark (Mr. Philip E. Gordon, Corporation Counsel of the City of Newark, attorney).
*564 LARNER, J.S.C.
Approximately 450 suits were instituted against the City of Newark, involving thousands of claims for property damage resulting from riots alleged to have occurred in the city between July 12 and 17, 1967. All such actions were consolidated for trial pursuant to court order and in accordance with a cooperative plan whereby a representative committee of attorneys was designated to conduct all legal proceedings in the litigation. Under the terms of said order all parties are bound by the determination of the court in the consolidated proceeding.
In an effort to dispose of certain issues and clarify others prior to trial, counsel for both sides of the controversy brought on several pretrial motions. The determination of these motions at this time will serve to limit and clarify the factual and legal questions to be considered at the plenary trial, and this opinion is intended to encompass only the issues raised by these motions.
The major facet of plaintiffs' claims against the city is the statutory liability based upon the provisions of N.J.S. 2A:48-1. In addition, plaintiffs found their claims upon a charge of common law negligence. The current motions and this opinion, however, do not involve the validity of the cause of action or defenses in negligence. The scope of the court's determination at this time is limited to the legal issues raised by the motions addressed to the statutory cause of action.

I

JUDICIAL NOTICE OF EXISTENCE OF RIOTS
The legal source of liability alleged by plaintiffs is N.J.S. 2A:48-1, which provides:
"When, by reason of a mob or riot, any property, real or personal, is destroyed or injured, the municipality if it has a paid police force, in which the mob congregates or riot occurs, or, if not in such a municipality, the county in which such property is or was situate, shall be liable to the person whose property was so destroyed or *565 injured for the damages sustained thereby, recoverable in an action by or in behalf of such person."
The sine qua non for the city's responsibility by the City under plaintiffs' factual allegations is the existence of a "riot" in the City of Newark on the days in question and a causal connection between such riot and the claimed damages. Plaintiffs assert that the court should take judicial notice of the existence of "riots" in the city between July 12 and 17, 1967 so as to obviate the necessity of proof thereof at the trial.
It is manifest that the term "riot" in the statute is a word of art representing a determination based upon a mixed question of fact and law. "Riot" is not defined in the legislation creating the cause of action, and resort must therefore be had to the common law definitions developed under the criminal law.
In State v. Lustig, 13 N.J. Super. 149 (App. Div. 1951), the Appellate Division defined a riot in the context of an indictment for the common law offense of incitement to riot as follows:
"A riot is a disturbance of the peace by three or more persons unlawfully assembled together and acting in a violent and tumultuous manner." (at p. 152)
Feinstein v. City of New York, 157 Misc. 157, 283 N.Y.S. 335, 339 (Mun. Ct. 1935), involved a claim for property damage against the city under the New York counterpart of N.J.S. 2A:48-1 et seq. The Municipal Court of the City of New York related and applied the definition of "riot" that had been applied by English courts under the English Riot (Damage) Act (49 and 50 Vict., c. 38, § 2):
"* * * a riot consists of the following elements: (1.) number of persons, three at least; (2.) common purpose: (3.) execution or inception of the common purpose; (4.) an intent to help one another by force if necessary against any person who may oppose *566 them in the execution of their common purpose; (5.) force or violence not merely used in demolishing, but displayed in such a manner as to alarm at least one person of reasonable firmness and courage."
Corpus Juris Secundum defines the term as follows:
"* * * a tumultuous disturbance of the peace by three or more persons, assembled and acting with a common intent, either in executing a lawful private enterprise in a violent and turbulent manner, to the terror of the people, or in executing an unlawful enterprise in a violent and turbulent manner." 77 C.J.S. Riot § 1 (1952).
Cf. 9 Halsbury, The Laws of England 471 (1912). See Marshall v. City of Buffalo, 50 App. Div. 149, 64 N.Y.S. 411 (App. Div. 1900).
At this juncture of the case the court is not called upon to verbalize the definitive language which will determine the meaning and limits of a riot within the intent of the applicable legislation. The foregoing definitions are reviewed rather for the purpose of setting the background for determining whether the court can or should take judicial notice of the existence of riots during the pertinent period.
Rule 9(2) of the Rules of Evidence (1967), N.J.S. 2A:84A-16, c. II, Rule 9(2), provides:
"Judicial notice may be taken, without request by a party, of (a) the decisional, constitutional, and public statutory law and rules of court of every other state, territory and jurisdiction of the United States, private acts and resolutions of the Congress of the United States and of the legislature of this State, and of every other state, territory and jurisdiction of the United States, and duly enacted ordinances and duly published regulations and determinations of governmental subdivisions or agencies of the United States, of this State, and of every other state, territory and jurisdiction of the United States; (b) records of the court in which the action is pending and of any other court of this State or federal court sitting in or for this State; (c) the law of foreign countries; (d) such facts as are so generally known or of such common notoriety within the area pertinent to the event that they cannot reasonably be the subject of dispute; and (e) specific facts and propositions of generalized *567 knowledge which are capable of immediate determination by resort to sources of reasonably indisputable accuracy."
Plaintiffs contend that the court should take judicial notice of the existence of riots pursuant to the discretionary authority of section (d) of the aforesaid rule.
Although it is generally known that there were civil disturbances in various sections of the City of Newark in July of 1967 (see State v. Chandler, 98 N.J. Super. 241, 243 (Cty. Ct. 1967)), knowledge of such occurrences in the generic sense does not suffice to obviate the necessity of proof of riots in the statutory sense. The relevant proofs would involve the nature and extent of the disturbance, the number of persons involved, the presence or absence of a common purpose, the time and place of a particular disturbance, and the causal connection between such disturbance and the damage. Whether such riots existed and whether they proximately resulted in the damages claimed by plaintiffs are thus ultimate issues in this case to be determined by the trier of the facts in accordance with the applicable law. This court should not take judicial notice of such an ultimate fact question which depends upon definitive legal criteria. Plaintiffs' application is therefore denied.

II

SUBROGATION CLAIMS
A substantial portion of the claims in these consolidated actions are subrogative in nature, having been instituted by insurance companies which covered the losses involved.
Defendant has moved to dismiss these subrogation claims on the ground that the statute contemplates payment only to the property owners who have suffered losses and should not be extended to afford recovery to insurance carriers in the absence of specific statutory authority. It is urged that since the statute is in derogation of common law, having created a cause of action which imposes liability without fault *568 upon the municipality where none existed before, it must be strictly construed and recovery limited only to the property owners who are affirmatively included in the legislation.
The insurance companies, on the other hand, point out that subrogation is a right arising aliunde the statute, and that their subrogative claims are founded upon general equitable principles and contractual rights contained in the policies of insurance.
Among the arguments advanced by the city in this connection is the assertion that N.J.S. 2A:48-7, which is a part of the overall legislation under consideration, grants a right of subrogation to the municipality against the rioters after payment to the claimants. It is suggested that this express provision for subrogation negates a legislative intent to permit recovery by any other subrogee against the city. This contention is without merit. This statutory right of subrogation is created in favor of the city against the active tortfeasors; it has no bearing upon the subrogative interest of an assignee of the claimant against the city. Such a statutory right of subrogation to the city does not per se affirm or negate the subrogative rights of the insurance companies.
Whether or not the Legislature in 1864, when the statute was first adopted, even considered the question of compensation for subrogative claims is impossible to determine from the legislation or any available interpretive aids. As far as the court can ascertain, the express, implied or apparent intent of the Legislature on this issue cannot be derived from the statute itself. Does it therefore follow, as urged by defendant, that legislative silence on the subject bars subrogees from the benefits created by the legislation?
Subrogation has always been highly favored in the law, Brewster & Son v. Catalytic Construction Co., 17 N.J. 20, 30 (1954), and, as a general rule, "an insurer, on paying a loss, is subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss." 6 Appleman, Insurance Law and Practice, § 4051, p. 517 (1942).
*569 As observed by the Supreme Court in Standard Accident Insurance Co. v. Pellecchia, 15 N.J. 162 (1954):
"Subrogation is a device of equity to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it, Camden Trust Co. v. Cramer, 136 N.J. Eq. 261, 264 (E. & A. 1944); Restatement of the Law of Security, § 141, comment (a). It is a right of ancient origin, having been imported from the civil law to serve the interests of essential justice between the parties, Sullivan v. Naiman, 130 N.J.L. 278, 280 (Sup. Ct. 1943). It is most often brought into play when an insurer who has indemnified an insured for damage or loss is subrogated to any rights that the insured may have against a third party, who is also liable for the damage or loss. In such a case it is only equitable and just that the insurer should be reimbursed for his payment to the insured, because otherwise either the insured would be unjustly enriched by virtue of a recovery from both the insurer and the third party, or in the absence of such double recovery by the insured the third party would go free despite the fact that he has the legal obligation in connection with the loss or damage." (at p. 171)
The statute in question created a new cause of action imposing strict liability upon a municipality for property damage caused by riots. Such a cause of action required legislative pronouncement because it eliminated in the field of municipal riot damage liability the negligence concept and the defense of governmental immunity. It represented a declaration of policy by the Legislature in this limited area in order to make the entire community responsible for the damage to innocent property owners resulting from a breakdown in law enforcement. Clark Thread Co. v. Board of Chosen Freeholders of Hudson, 54 N.J.L. 265, 266 (Sup. Ct. 1891); Wells Fargo & Co. v. Mayor, etc., of Jersey City, 207 F. 871, 874, 878 (D.N.J. 1913), affirmed 219 F. 699, 700 (3 Cir. 1915), certiorari denied, 239 U.S. 650, 36 S.Ct. 284, 60 L.Ed. 485 (1916); County of Allegheny v. Gibson's Son & Co., 90 Pa. 397, 412, 418 (Sup. Ct. 1879).
Whether a cause of action exists by common law or statute is of no significance on the right of a subrogee to enforce its claim against the obligor or tortfeasor. Accord, Dworak v. Tempel, 17 Ill.2d 181, 161 N.E.2d 258 (Sup. *570 Ct. 1959); 46 C.J.S. Insurance § 1209, n. 20 (1946). Similarly, it is clear that there is no significant distinction between the nature of the right of action created by this statute from other statutory causes of action or common law causes of action resulting from the development of judge-made law. If an insurance carrier has a right to enforce a claim of its assured against any tortfeasor, there would appear to be no valid reason for barring its claim against a municipality under the circumstances herein merely because the underlying cause of action is founded upon statute or strict liability. In fact, it would be unjust to permit the municipality to avoid its statutory responsibility because of the fortuitous circumstance that the injured person had insurance coverage. Standard Accident Insurance Co. v. Pellecchia, supra, 15 N.J., at p. 171; Also cf. the collateral source doctrine, Long v. Landy, 35 N.J. 44, 55 (1961); Durr v. Freehold Construction Co., 9 N.J. Misc. 267, 269 (Sup. Ct. 1931).
There are no reported cases in this State dealing with the right of an insurance company subrogee to recover under the civil right statute. The issue has been considered in a limited number of cases in foreign jurisdictions which have parallel legislation granting civil recovery against governmental entities for damages resulting from riots.
In Northern Assurance Co., Ltd. v. City of Milwaukee, 227 Wis. 124, 277 N.W. 149, 151 (1938), the Wisconsin Supreme Court sustained the subrogative cause of action under the statute in favor of an insurance company on the simple articulation that its right was no different from that of an insurance carrier under an automobile collision policy.
A similar conclusion was reached by the Supreme Court of California in a case involving an individual who had been assigned claims arising under a mob violence statute. Agudo v. Monterey County, 13 Cal.2d 285, 89 P.2d 400 (1939).
Defendant points to Sun Indemnity Co. of New York v. Board of Education of City of New York, 264 App. Div. 73, *571 34 N.Y.S.2d 475 (App. Div. 1945), as a contrary precedent. That case involved a New York statute which compelled the board of education to indemnify a teacher for liability incurred through activities arising out of his employment. The teacher's liability carrier, who had paid the injured person on his claim against the teacher, sought recovery against the city by virtue of its subrogation rights under the insurance policy. The court held that the indemnity statute was intended for the personal benefit of the teacher alone and that the carrier, as subrogee, was not contemplated as a beneficiary thereof.
The Sun Indemnity case is clearly distinguishable. The indemnity provided by the statute therein was based upon the employer-employee relationship between the board of education and the teacher, and the legislative policy to reimburse the teacher for expenses incurred as a result of payment by him to a claimant arising out of his teaching activity. The purpose and policy of that legislation was manifestly for the personal reimbursement of the employee-teacher, and the moneys were paid by the board as a matter of legislative policy and not because of any wrongdoing on its part.
Under the riot statute, however, the city in effect is a wrongdoer. The Legislature has designated it as such for failure to enforce the laws and control its inhabitants. Even though its wrongdoing is passive and the damage is directly caused by an active wrongdoer, nevertheless its liability is founded upon a legislative declaration motivated by the municipality's failure to protect property in its confines. The limited personal purpose of the teacher indemnification statute cannot be found in the civil riot statute.
In the absence of an affirmative prohibition in the statute or an overriding equity, the insurance carriers as subrogees in effect step into the shoes of their insureds and are granted or denied recovery based upon the rights of those insureds as aggrieved property owners under the statute. The motion of the defendant to dismiss the subrogation claims is denied.

*572 III

LIMITATIONS
N.J.S. 2A:48-2 provides that "No action under this article shall be instituted unless commenced within 3 months after the loss of or injury to the property." By this section the Legislature established a specific statute of limitations applicable to claims brought under the Civil Riot Act, and it therefore cannot be disputed that any actions instituted against the city more than three months after the loss are barred.
When the extensive losses and damages occurred in the City of Newark, the insurance companies who covered real and personal property for riot damage in the affected areas were faced with the destruction of their potential subrogation claims against the City unless they took some legal action within three months. The number of claims and the problems of appraisal and adjustment made it apparent that payment to assureds and the vesting of the rights of subrogation could not be consummated within the limitation period. It was also apparent that the individual assureds would not undertake the burden of instituting suits against the city in view of their absolute right of recovery under the insurance policies.
Therefore, in an effort to preserve their rights, the insurance carriers instituted actions in the Chancery Division which set forth the names of the companies, the names of their assureds, the statutory cause of action and the companies inchoate right of subrogation which would become vested upon payment. Subsequently, upon payment to the particular assureds, the companies filed suits in the Law Division in the names of their respective assureds, some of which were instituted within the three-month period and others beyond that period.
The city contends that all actions in the Law Division filed after the expiration of three months from the accrual of the damages are barred regardless of their inclusion in the Chancery Division actions instituted in the names of *573 the insurance carriers. The city urges that in the absence of payment to the assureds, the carriers had no rights as subrogees which would sustain the cause of action in the Chancery Division, Schmid v. First Camden National Bank and Trust Co., 130 N.J. Eq. 254, 269 (Ch. 1941); Meredith v. The Ionian Trader, 279 F.2d 471 (2 Cir. 1960); and that as a consequence, the filing of the Chancery action within three months is ineffective to avoid the bar of the statute of limitations.
The statute (N.J.S. 2A:48-2) requires only that "an action" be instituted, and the Chancery actions were in fact instituted within the designated period. Hence, the city had notice within that period of the pendency of claims by the insurance carriers, as potential subrogees of named claimants, for damages resulting from the July 1967 civil disturbances. The city does not and cannot point to any prejudice resulting from the procedural techniques utilized by the carriers in their effort to comply with the statute.
Since the policy of the statute of limitations to avoid stale claims and give early notice to the city has been satisfied, fairness and equity dictate that plaintiffs should not be deprived of their remedy by the city's plea.
New York Central and Hudson R.R. Co. v. Kinney, 260 U.S. 340, 43 S.Ct. 122, 67 L.Ed. 294 (1920), involved an amendment to a complaint alleging an essential element of the cause of action and filed subsequent to the running of the statute of limitations. Mr. Justice Holmes observed:
"* * * but when a defendant has had notice from the beginning that the plaintiff sets up and is trying to enforce a claim against it because of specified conduct, the reasons for the statute of limitations do not exist, and we are of [the] opinion that a liberal rule should be applied." (at p. 346, 43 S.Ct., at p. 123)
Although the rights of the carriers had not yet matured when the Chancery actions had been instituted, they did have a type of equitable interest arising out of the subrogation clause of the insurance contract and the claims *574 pending against them by the assureds. Such an equitable interest may not be sufficient to invoke the jurisdiction of a court of law, but it is adequate for the granting of relief by a court of equity, with its flexible power to lend its aid in unusual situations. Crane v. Bielski, 15 N.J. 342 (1954); Brown v. Fidelity Union Trust Co., 10 N.J. Misc. 555 (Ch. 1932); Britton v. Supreme Council of Royal Arcanum, 46 N.J. Eq. 102, 112 (Ch. 1889). affirmed 47 N.J. Eq. 325 (E. & A. 1890).
Furthermore, even if the companies had no status to bring the actions at the time they were initiated, so long as the Chancery suits were in fact brought within time, the subsequent payment of losses by the carrier plaintiffs relates back to validate the status of these plaintiffs and the actions commenced by them. Such a result was reached by the Appellate Division in an analogous situation in City of Trenton v. Fowler-Thorne Co., 57 N.J. Super. 196, 203 (App. Div. 1959), affirmed, 32 N.J. 256 (1960).
In that case the suit by the municipality was initially instituted without authority of the governing body. After the expiration of the statute of limitations the governing body ratified the action of the single commissioner in bringing the lawsuit. Defendant moved to dismiss on the basis that the limitation period had run and it therefore had a vested right to the repose of the statute. The motion was denied by the trial court.
The Appellate Division, in affirming, stated that a principal's ratification of an agent's unauthorized act will validate the act from its inception in the absence of intervening rights of third persons who may have acquired interests with which it would be unjust to interfere. 57 N.J. Super., at p. 204. It found that the rights of the defendant were not so substantial as to require immunity from continuation of the action, and that "the date of its actual institution should ordinarily, in logic and principle, continue to control as to the incidence of limitations." At p. 206. It held *575 that under the circumstances surrounding the case the timely institution of suit did subserve the policy objectives of the statute of limitations notwithstanding the technical deficiency in the authority to bring the suit in the first place. At pp. 207-208.
Similar principles of justice and fairness have impelled courts to refuse to enforce strictly the statute of limitations in the comparable situation of a suit instituted by a party who lacks legal capacity to do so, Norko v. Rau, 107 N.J.L. 479, 481, 482 (E. & A. 1930), or the situation where correction of improper parties is permitted after the statute has run, Lehigh Coal & Navigation Co. v. Central R.R. Co., 42 N.J. Eq. 591 (Ch. 1887); Annotation, 74 A.L.R. 1266, 1275 (1931); Kansas Electric Power Co. v. Janis, 194 F.2d 942 (10 Cir. 1952); Kilbourn v. Western Surety Co., 187 F.2d 567 (10th Cir. 1951); Levinson v. Deupree, 345 U.S. 648, 652, 73 S.Ct. 914, 97 L.Ed. 1319 (1953); McDonald v. State of Nebraska, 101 F. 171, 174-181 (8 Cir. 1900).
As observed by Judge Conford in the analogous case of City of Trenton v. Fowler-Thorne Co., supra:
"The New Jersey courts apply two tests in determining whether or not a defective suit brought in good time may be cured after the time has run and still preclude the defense of statute of limitations. These are, first, that the defect must be of such a nature that it is curable without the necessity of dismissing the suit and beginning anew; second, that the cure itself must not subject the defendant to liability of a greater or substantially different kind from that of the original action, that is, the cause of action must remain unchanged. See Levey v. Newark Beth Israel Hospital, 17 N.J. Super. 290, 293 (Cty. Ct. 1952); Russo v. Wright Aeronautical Corporation, 1 N.J. 417 (1949); Welsh v. Board of Education of Tewksbury Tp., 7 N.J. Super. 141, 145-146 (App. Div. 1950); O'Shaughnessy v. Bayonne News Co., 9 N.J. Misc. 345 (Cir. Ct. 1931), affirmed 109 N.J.L. 271 (E. & A. 1932); Magliaro v. Modern Homes, Inc., 115 N.J.L. 151, 157 (E. & A. 1935)." (57 N.J. Super., at p. 207)
In light of this language, it is the court's conclusion that the alleged defect involving nonpayment of the claims by the insurance companies is not of such a substantive nature that *576 it would require the dismissal of the suits, and that the relation back of the subsequent payments does not subject defendant to any greater or different kind of liability from that of the original action.
As a result, all claims filed under the statute within three months of the damage, either in the Law Division or Chancery Division by individual claimants or their carriers-subrogees, will be adjudicated on their merits, and the defense of the bar of limitations will be stricken as to them. It follows, therefore, that the defense of the statutory limitation will constitute a bar to all claims filed subsequent to the expiration of the three-month period, as well as to those subrogative claims of insurance companies which have not matured by payment to the assureds before the date of trial.

IV

DAMAGES RECOVERABLE UNDER STATUTE
The city has moved to bar recovery for all losses resulting from theft or looting. This motion is based upon the contention that the language of N.J.S. 2A:48-1 reflects a legislative intent to limit recovery only to losses resulting from physical damage and destruction of real and personal property. The pertinent portion of the statute provides:
"When, by reason of a mob or riot, any property, real or personal, is destroyed or injured, the municipality * * * shall be liable to the person whose property is or was so destroyed or injured." (Emphasis added)
There are no cases in New Jersey which construe the applicability of the statute to losses resulting from theft or looting, and foreign jurisdictions are in conflict in construction of their own civil riot statutes.
Defendant cites Yalenezian v. City of Boston, 238 Mass. 538, 131 N.E. 220 (Sup. Jud. Ct. 1921), in support of its position. The Massachusetts statute in issue is similar to *577 ours, providing compensation for property destroyed or injured by a riot or mob. Mass. Ann. Laws, c. 269, § 8 (1966 Supp.). The Supreme Judicial Court of Massachusetts in construing that statute held that the legislation did not contemplate recovery for theft. Its rationale was expressed as follows:
"A theft of property does not signify that the thing stolen has been destroyed or injured; it imports only an injury to the possessory right of the general or special owner to use and enjoy the thing which is capable of being stolen, by taking and carrying it away. By theft the owner does not lose the title or right to possession of the stolen property. He may retake it whenever and whereever he can find it; and he can have for his assistance any force of the criminal and civil law. The statute awards compensation within its terms, to owners of property destroyed or injured as a matter of favor, of public policy and not of right. It follows that there can be no incongruity in denying compensation for injury to property and property rights which are without the purview of the statute." (131 N.E., at p. 222).
The Supreme Court of Rhode Island came to the same conclusion under a similar statute in Goldman v. Forcier, 68 R.I. 291, 27 A.2d 340 (1942). General Laws of Rhode Island, 45-15-13 (1956). In interpreting the language of the statute, the Rhode Island court stated:
"In using the words destroy and injure in direct connection with the word property, and by addressing itself solely to the destruction and injury of property in dealing with the amount of recovery allowed under the statute, the legislature used language that is clear and unmistakable. The words destroy, injured, destruction and injury do not mean, nor necessarily imply either in law or in ordinary speech, the felonious taking and carrying away of the property of another.

* * * * * * * *
The fact remains that if the legislature had intended to allow compensation for property stolen during a riot, nothing would have been simpler than for it to say so. By limiting recovery to a certain percentage of the `property' that is `destroyed' or `injured' in a riot, the legislature precluded the inference that it intended the statute to also cover property that was neither destroyed nor injured, but was taken and carried away with intent to steal it. If the omission of terms or language sufficient to indicate that it was the intention *578 of the legislature to allow recovery for property stolen during a riot was due to accident, then it belongs to the legislature to supply such terms or language." (27 A.2d, at p. 343.)
Unlike Massachusetts and Rhode Island, courts of other states with parallel statutes have reached a contrary result. New York has a statute which provides that a city shall be liable to a person "whose property is destroyed or injured therein by a mob or riot for the damages sustained thereby." N.Y. General Municipal Law, McKinney's Consol. Laws, c 24, (1965), currently suspended by N.Y. Unconsol. Laws, § 9193 (McKinney 1961). The New York courts have had no difficulty in construing their statute to include damages resulting from theft or looting. Sarles v. Mayor, etc., of City of New York, 47 Barb. 447, 451 (Sup. Ct. 1866); Solomon v. Kingston, 24 Hun 562 (Sup. Ct. 1881), affirmed, 96 N.Y. 651 (Ct. App. 1884). In the latter case the Supreme Court reasoned:
"The evident meaning of the act, chapter 428, Laws 1855, is to compensate persons who suffer in their property by reason of mobs and riots. It could make no real difference whether the rioters actually destroyed the personal property on the premises of Solomon, or whether they took it out of his premises and then actually destroyed it. And whether they destroyed the books and shoes by cutting them to pieces, or by wearing them out would matter very little to the plaintiff. We think that the fair meaning of the act is that given in Sarles v. New York (47 Barb. 447); that the property was destroyed, as to the plaintiff when the rioters carried it off. Plunder, as well as wanton injury, is usually the work of such rioters; and the result to the injured person is the same from either wrongdoing." 24 Hun at p. 564.
Illinois, Wisconsin, Montana, Pennsylvania and Maryland have also permitted recovery for theft and looting under their riot statutes. Spring Valley Coal Co. v. City of Spring Valley, 65 Ill. App. 571, 590 (App. Ct. 1896); Febock v. Jefferson County, 219 Wis. 154, 262 N.W. 588, 101 A.L.R. 95 (Sup. Ct. 1935); Butte Miner's Union v. City of Butte, 58 Mont. 391, 194 p. 149, 13 A.L.R. 746 (Sup. Ct. 1920); *579 Burgis v. County of Philadelphia, 169 Pa. Super. 23, 82 A.2d 561 (Super Ct. 1951); Braid v. County of Philadelphia, 169 Pa. Super. 244, 82 A.2d 564 (Super. Ct. 1951); Mayor, etc., of Baltimore v. Poultney, 25 Md. 107 (Ct. App. 1866).
The history of the legislation is of some interest in seeking clues to legislative intent. The statutory liability of municipalities for riot damage had its genesis in England in 1285 when the Statutes of Winchester provided a remedy to the victim against one or more inhabitants of the "hundred," a division of a county in early England, for damage caused by robbery. Statute of Winchester, 13 Edw. I, Stat. 2, c. 2 (1285), reenacted by 28 Edw. III. c. 2 (1354). A subsequent statute provided for the assessment of damages against all the inhabitants of the hundred after a recovery against one or more. 27 Eliz., c. 13 (1585). In 1714 the Riot Act of George I provided that in the event of destruction of a church or dwelling house by an unlawful mob, the inhabitants of the hundred were liable for the value. 1 Geo. I, c. 5 (1714). Thereafter, all laws on the subject in England were embodied in the Riot Damages Act of 1886, 49 & 50 Vict., c. 38 (1886), section 2 of which imposes absolute liability upon English police districts "[w]here a house, shop or building * * * has been stolen or destroyed or where property therein has been injured, stolen, or destroyed." See Johnson, "The Insurer and Civil Disorders," 35 Insur. Counsel J. 417 (1968); County of Allegheny v. Gibson's Son & Co., supra, 90 Pa., at p. 405; Wells Fargo & Co. v. Mayor, etc., of Jersey City, supra, 207 F., at pp. 876, 880.
These statutes were first transplanted to this country by the Commonwealth of Pennsylvania in 1841. Act of May 31, 1841, Pamph. L. 416. New York followed in 1855. L. 1855, c. 428. The New Jersey statute, first adopted in 1864, was patterned after the foregoing legislation and provided recovery against a municipality for damages sustained "whenever any buildings or other real or personal property shall be destroyed or injured, in consequence of any mob or riot." L. *580 1864, c. 150; Clark Thread Co. v. Board of Chosen Freeholders of Hudson, supra. This language in the statute was retained until the adoption of the Revised Statutes of 1937, when the surplusage "buildings or other real or personal property," was eliminated from the statute without any apparent intent to change its meaning and the language of the current statute was substituted: "When, by reason of a mob or riot, any property, real or personal, is destroyed or injured * * *." 1 Second Draft of Proposed Revision and Consolidation of Public Statutes of New Jersey, § 2:63-1 (1936); R.S. 2:63-1 (1937).
It is of interest that although the English genesis of the New Jersey statute dealt with damages resulting from robbery in that specific language, American statutory counterparts have not made particular reference to damages from robbery, larceny or other forms of theft. They have all resorted to the general language of destruction or injury to property.
The shibolleths of statutory construction to the effect that penal statutes shall be strictly construed and remedial statutes shall be liberally construed are of no value in this instance because the statute is both remedial and penal in nature; it seeks simultaneously to grant relief to the innocent member of society who sustains damage from a riot and to penalize the municipality for its failure to prevent destruction of property by riotous mobs. County of Allegheny v. Gibson's Son & Co., supra, 90 Pa., at p. 418; Marshall v. City of Buffalo, supra, 50 App. Div., at p. 415, 64 N.Y.S. 411. Hence, it is more meaningful to seek the intent of the Legislature through a common sense approach.
It is manifest that the Legislature intended to grant relief for destruction and damage to property, while it did not intend to include all damages and losses resulting from the riots. Nevertheless, as observed by the majority of courts of other states who have passed upon the issue, the loss to the owner is the same whether the personal property is totally destroyed or removed or stolen. For all practical purposes, *581 he has been deprived of its value and use in either event. And if the Legislature intended that he be compensated for damage or destruction, it undoubtedly intended that he be compensated for its theft or removal, provided that such theft or removal is the proximate result of the riot. The reasoning of the Massachusetts court in Yalenezian v. City of Boston, supra, and the Rhode Island court in Goldman v. Forcier, supra, is too narrow and does not have the force of logic or justice to lend persuasive weight to their conclusion.
It is more reasonable and realistic to interpret the legislative intent as including damage from theft or looting, particularly since rioting involving damage to real and personal property usually is accompanied by indiscriminate theft and looting. It may reasonably be assumed that such acts were contemplated by the Legislature when it adopted in 1864 the law patterned after the statutes of New York and Pennsylvania.
It is therefore determined that plaintiffs may recover not only for physical damage or destruction of property but also for the loss of such property from theft or looting. Of course, underlying the right of recovery for such losses is the prerequisite that plaintiffs establish that the riot or riots were the proximate cause of the claimed damages.
The city also attacks another area of damage asserted by plaintiffs  namely, losses from business interruption, loss of profits and good will, and other losses of an intangible nature.
As already noted, the Legislature did not intend and did not couch the language of the statute to include all damages and losses resulting from riots. In fact, personal injuries are not encompassed within the recovery granted by N.J.S. 2A:48-1. Such damages are recoverable up to a maximum of $5,000 when caused in the limited situation of a mob of 5 or more persons who are "assembled for the unlawful purpose of offering violence to the person or property of anyone supposed to have been guilty of the violation of a law, or for *582 the purpose of exercising correctional powers or regulative powers over any person, by violence and without lawful authority * * *." N.J.S. 2A:48-8.
It is evident that the Legislature did not create a cause of action which carried with it all damages naturally flowing from the wrong as in the ordinary tort action. Instead, it saw fit to impose responsibility upon the governmental unit and all its taxpayers for a limited portion of the resultant losses  namely, that associated with the damage, destruction or loss of tangible, physical property. This unusual limitation of damages accompanying the creation of a new cause of action was undoubtedly the product of a balancing of the plight of the property owner against the financial ability of municipalities and their taxpayers to undertake payment of a broad spectrum of damages and losses. The result was a form of compromise, granting partial rather than total reimbursement to the riot victim.
In this context, it is meaningless to indulge in the use of artificial rules of statutory interpretation leading to a conclusion of strict construction merely because the act is "in derogation of common law." It is more meaningful to consider the realistic impact upon a municipality and its tax structure if the statute were to be interpreted to encompass all the potential intangible losses resulting from the occurrence of the riots. Such claims could be so extensive and substantial that the burden of their payment might destroy the financial stability of many of our municipalities. And since the Legislature did not clearly and unmistakably permit recovery for all losses or damages, a provision which could have been accomplished by the use of a few simple words, a court cannot expand the recoverable damages beyond the express language of the statute.
The case of Wells Fargo & Co. v. Mayor, etc., of Jersey City, supra, is the only case dealing with this issue under the New Jersey statute and, in fact, is the only case in the country squarely passing upon the question. But see the *583 dictum in Palmer v. City of Concord, 48 N.H. 211, 218 (Sup. Ct. 1868). The Federal District and Circuit Courts, relying in part upon the former language of the statute, "buildings or other real or personal property," held that intangible property losses were not recoverable. In support of its conclusion the District Court stated:
"Can it be that, merely because the statute used the word `property', the Legislature intended to burden its municipalities with all the injurious consequences resulting from the mob's interference with the use of tangible property? A construction fraught with such appalling consequences is not to be adopted unless the legislative intent that such is its purpose is clear and unmistakable." (207 F., at p. 880).
As already observed, the change in language in the current statute came about with the 1937 revision. It is the court's opinion that this change was not substantive and was solely for the purpose of eliminating awkward surplusage. The 1937 Legislature clearly did not undertake to change the meaning of the act to expand the recoverable damages. In any event, whether the statute be considered in the pre-1937 form or in its current form, the same rationale applies, leading to the conclusion that the law was not intended to grant recovery for intangible property losses.
Plaintiffs endeavor to support their position by reference to the broad meaning of "property" as normally including both tangible and intangible assets. Barr v. Essex Trades Council, 53 N.J. Eq. 101, 112 (Ch. 1894). They also point to the general definitions applicable to all New Jersey statutes which include the following:
"`Personal property' includes goods and chattels, rights and credits, moneys and effects, evidences of debt, choses in action and all written instruments * * *." (N.J.S.A. 1:1-2)
If these general definitions were the true criterion, intangible property would normally be included in a statutory reference to "personal property." However, the opening paragraph *584 of N.J.S.A. 1:1-2 contains the caveat that the words and phrases shall have the designated meanings "[u]nless there is something in the subject or context repugnant to such construction * * *."
It is evident that the subject matter and context of N.J.S. 2A:48-1 are repugnant to the alleged construction, and that the general definitions are not applicable.
The motion barring recovery for intangible property losses is granted.

V

NOTICE
One of the conditions for recovery under N.J.S. 2A:48-1, et seq., is the notification requirement in N.J.S. 2A:48-3:
"Nor shall a recovery be had unless the claimant used all reasonable diligence to prevent the destruction or injury and shall have, immediately after being apprized of a threat or attempt to destroy or injure his property by a mob or riot, notified the mayor or chief executive officer or chief of police of the municipality or the sheriff of the county, as the case may be, of the facts brought to his knowledge."
Plaintiffs have moved to strike the 11th separate defense which states, "Plaintiff(s) failed to apprise the defendant or other law enforcement agencies of the threat or attempt to destroy or injure their property."
The motion addressed to this defense was not accompanied by affidavits, and it must therefore be considered as purely a motion to strike the defense as insufficient in law. Despite the protestations in plaintiffs' brief as to the nature of the disturbances, the lack of opportunity to give notice and the uselessness of notice under the circumstances, the court cannot determine this motion on such assertions. It is obvious that the defense on its surface is a valid one under the applicable provision of the statute. Whether claimants were required to give notice because of a prior threat or attempt to destroy their property, and whether such actual notice was *585 necessary even if there were prior threats, must await the development of underlying facts at a plenary trial. It would be meaningless for the court to discuss in the abstract the legal principles applicable to the notice requirement until all the facts are fully explored.
The motion to strike this defense is therefore denied.

VI

DEFENSE OF GOVERNMENTAL IMMUNITY
Plaintiffs have moved to strike the defense of municipal immunity. Although this defense has been asserted as to both the common law negligence and statutory causes of action, the court will limit its ruling at this time to the claim brought under the statute.
It is abundantly clear that the affirmative creation of a cause of action against a municipality by the Legislature impliedly eliminates the defense of municipal immunity to that cause of action. The statute specifically deals with the liability of municipalities and counties and therefore negates the continued availability of immunity which had existed prior thereto.
The defense of municipal immunity is stricken as to the statutory cause of action.

VII

EFFECT OF GOVERNOR'S EMERGENCY PROCLAMATION
Defendant has alleged that on July 14, 1967, at 2:45 A.M., the Governor of the State of New Jersey proclaimed a state of emergency in the City of Newark pursuant to the provisions of N.J.S.A. App. A:9-30 et seq. It is asserted that as a consequence of this proclaimed emergency, the Governor called out the National Guard and issued various regulations, thereby assuming control of the city and the disturbances occurring *586 therein. N.J.S.A. App. A:9-34, 9-45; Governor's Select Commission on Civil Disorder, Report for Action, 117 (1968). Because of this assumption of control by the State, defendant contends that it is not liable for any damages or losses occurring subsequent thereto.
Plaintiffs have moved to strike this defense as insufficient in law.
It is noteworthy that neither the aforesaid provisions nor any other legislative enactment has declared that the cause of action created by N.J.S. 2A:48-1 is barred or suspended in part or in whole during the existence of the proclaimed emergency.
The cause of action under the statute arose at the time of the occurrence of the alleged riots; the city became liable for all the damage to property proximately caused by those riots. The declaration of the emergency, with its implementation by National Guard troops and imposition of restrictions and regulations was but a step in the control of the disturbances that did not in any way limit or suspend the duties of the city and its liability under the statute.
In County of Allegheny v. Gibson's, Son & Co., supra, decided under the Pennsylvania statute, the county also raised the defense that after the appearance of the military forces of the state pursuant to the order of the chief executive, the responsibility of the county ceased. The court pointed to the fact that although the issue was not specifically raised, recovery was permitted against the local governmental unit despite the use of military power to quell the disturbances in the cases arising out of the "No Popery" riots of London in 1780, the Philadelphia riots in 1844, and the draft riots of New York in 1863. The court stated:
"* * * where liability for mob violence is imposed without qualification, it is not within the scope of judicial power to write exceptions into the law which the legislature, in its wisdom, has not seen proper to place there." (90 Pa. 397, at p. 419).
*587 In addition:
"The law will not tolerate the spectacle of a great city looking on with indifference, while property to the value of millions is being destroyed by a mob. To prevent just such occurrences was one of the objects of the Act of 1841. The fact that the state, when called upon, rendered its assistance, and sent a portion of its military to the scene, did not absolve the county from its implied obligation to preserve the peace, nor from its responsibility for a neglect of duty. Were it otherwise, it might be to the interest of a municipality to increase the size of the mob." (at p. 420).
As a consequence, it affirmed the ruling of the trial court in rejecting a request of defendant to charge the jury that the takeover by the state militia relieved the county from any liability for losses occasioned thereafter. Ibid., at p. 417.
It is therefore determined that the declaration of the emergency by the Governor and the use of National Guard troops did not relieve or lessen the liability of the city for all the property damage contemplated by the statute which is causally connected with the riots. The defense advanced by the city has no basis in law and will be stricken.

APPENDIX
For general discussions of municipal liability under civil riot statutes, consult the following:
Note, "Compensation for Victims of Urban Riots," 68 Colum. L. Rev. 57 (1968)
Note, "Municipal Liability for Riot Damage," 81 Harv. L. Rev. 653 (1968)
Note, "Communal Liability for Mob Violence," 49 Harv. L. Rev. 1362 (1936)
Note, "Riot Insurance," 77 Yale L.J. 541 (1968)
Legislation, "Liability of the Municipality for Mob Violence," 6 Ford L. Rev. 270 (1937)
Note, "Municipal Tort Liability: Statutory Liability of Municipalities for Damage Caused by Mobs and Riots: New York General Municipal Law Section 71: Suspension of the Statute," 50 Cornell L.Q. 699 (1965)
Note, "Municipal Liability for Riot Damage," 16 Hast. L. Rev. 459 (1965).
*588 At the time of the filing of this opinion, a bill has been introduced in the Legislature of New Jersey to amend N.J.S. 2A:48-1 to provide as follows:
"When, by reason of a mob or riot, any property, real or personal, is destroyed or injured, the municipality if it has a paid police force, in which the mob congregates or riot occurs, or, if not in such a municipality, the county in which such property is or was situate, shall be liable to the person whose property was so destroyed or injured for the damages sustained thereby, recoverable in an action by or in behalf of such person, in an amount not to exceed $10,000.00 for the aggregate of damage done to all such property, both real and personal, at each separate location within a municipality, provided; however, that no person, and no subrogee of such person, having insurance coverage in whole or in part for the said destruction or injury, shall have a cause of action against such municipality or county pursuant to the provisions of this act. For the purpose of this section, insurance coverage means insurance obtained through any source whatsoever, including insurance purchased through any insurance pool, placement facility, plan of operation, or any other plan established pursuant to Federal or State law." Senate, No. 913 (1968).